Volume I
Pages 1-172

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

Civil Action
NO. 05-450-S

LYNN M. SUTHERLAND, Plaintiff,

vs.

HYC, INC. and JEFFREY BARROWS, Defendants.

DEPOSITION of LYNN MATTHEWS-SUTHERLAND, a witness in the above-entitled cause, taken on behalf of the Defendants, before Barbara M. Montijo, RPR, Commissioner in and for the State of Rhode Island, at the Law Offices of Michael R. Hagopian, 212 Greenwich Avenue, Warwick, Rhode Island, on July 11, 2006, scheduled at 10:00 a.m.

DUNN & GOUDREAU
COURT REPORTING SERVICE, INC.
One State Street
Boston, MA 02109
(617) 742-6900



APPEARANCES:

PATRICK D. BARRY, ESQUIRE
DECOF & DECOF
ONE SMITH HILL
PROVIDENCE, RI 02903
TELEPHONE NO. (401) 272-1110
FOR: LYNN M. SUTHERLAND

THOMAS J. MUZYKA, ESQUIRE
CLINTON & MUZYKA, P.C.
ONE WASHINGTON MALL
BOSTON, MA 02108
TELEPHONE NO. (617) 723-9165
FOR: HYC, INC. and JEFFREY BARROWS



INDEX


| WITNESS | PAGE |
|---|---|
| LYNN MATTHEWS-SUTHERLAND | |
| Examination by Mr. Muzyka | 4 |


EXHIBITS


| NO. (Defendants) | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Photograph | 142 |
| 2 | Photograph | 142 |
| 3 | Photograph | 142 |
| 4 | Photograph | 142 |
| 5 | Photograph | 142 |
| 6 | Photograph | 142 |
| 7 | Photograph | 142 |
| 8 | Photograph | 142 |
| 9 | Photograph | 142 |


*Reporter's Note:
(Exhibits were retained by Attorney Muzyka)



(DEPOSITION COMMENCED AT 10:05 A.M.)

LYNN MATTHEWS-SUTHERLAND

The deponent, having been satisfactorily identified and duly sworn by the Notary Public, deposes and testifies as follows:

EXAMINATION BY MR. MUZYKA

MR. MUZYKA: Before we take the deposition, we're going to take it pursuant to the Federal Rules of Civil Procedure, but we're going to note that there will be a change. We'll reserve all objections until the time of trial, except as to form, and that the witness is going to read and sign the deposition.

MR. BARRY: Sure.

MR. MUZYKA: Is that acceptable?

MR. BARRY: Yes.

Q. Ms. Sutherland, my name is Tom Muzyka. I'm an attorney representing the defendants in this case. I represent the corporation that owns the vessel and I also represent Jeffrey Barrows personally. I'm going to ask you a number of questions concerning various areas that will be an issue in any claim that you make against the vessel; for example, there will be the

A. Yes.
Q. Now, you believe you had further earnings based on your specs, of what you already picked out and were entitled to, commissions; is that correct?
A. Absolutely.
Q. And you think it's $100,000, possibly more; is that correct?
A. Yes. If I had the spreadsheets in front of me, I could tell you.
MR. BARRY: Wait for a question.
Q. Do you have the spreadsheets at home?
A. Yes.
Q. Do they show what you were actually paid, what you believe your actual earned commissions were and what the differences are?
A. Yes.
Q. Can you make those available to your lawyer so I could take a look at them?
A. I believe they have them.
MR. MUZYKA: Just for the record, I'm asking you for them. All right?
MR. BARRY: Sure. I will tell you I personally don't know whether we do or not. I



don't think it will be a problem, but I'll talk to John.
Q. Did you have any other source of income from the year 2000 to the present time other than what we've already discussed?
A. No.
Q. You didn't have any type of investment income in the stock industry or any other place that you were working as a business?
A. No.
Q. When you were a child, you grew up in Queens?
A. No. I grew up on Long Island.
Q. Where on Long Island?
THE WITNESS: The name of that town?
MR. MUZYKA: Yes.
A. Franklin Square.
Q. Do you have a summer home on Long Island?
A. Yes, we do.
Q. Where was your summer home located?
A. Northport.
Q. During the times that you were in Northport, was your summer home on the water?
A. Yes.
Q. Did your family have boats?



A. Yes.
Q. What type of boats did you have as an adolescent?
A. Motorboat.
Q. What type of a boat? If you could, just describe it for me.
A. Water skiing boat.
Q. Speedboat?
A. Uh-huh, speedboat.
Q. 17, 20 feet?
A. Yes.
Q. Any other boats that the family owned?
A. Sunfish.
Q. Any other boats?
A. No.
Q. Would you operate the speedboat, the water skiing boat and the Sunfish?
A. No.
Q. Your brothers would?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. Did you ever go on those boats when you were a child?



A. The speedboat. The Sunfish once in a while.
Q. Did your family belong to any country club or yacht club in Northport?
A. No.
Q. Does your family still own the home in Northport?
A. Yes.
Q. What's the address?
A. [redacted]
Q. With regard to the time you were in Northport, say, from age 10 to age 20, would you go out on other boats?
A. No.
Q. When you married Mr. Sutherland, you were approximately 34?
A. Thirty-three.
Q. From 33 to the present, has your family owned any boats?
MR. BARRY: Her immediate family?
Q. Yes, your immediate family. Jack and your two children?
A. My son has a Laser and my daughter has an Opti.
Q. What is a Laser?
A. It's like a Sunfish. It's a sailboat for one

person that I don't think adults sail it. It's more or less for 14-year-olds, 13, 14, 15, 16-year-olds could sail a Laser and you sail it on your own.
Q. Have you ever sailed it?
A. No.
Q. What is your daughter's boat?
A. It's an Opti. It's like a little rowboat with a sail.
Q. Have you ever sailed that?
A. No.
Q. Have you ever been on either the Laser or the Opti?
A. No.
Q. Does your family belong to a yacht club?
A. No. My family, my immediate family?
Q. Your immediate family.
A. I'm sorry, yes. Port Washington Yacht Club.
Q. How far is that from your home in Manhasset?
A. Ten minutes.
Q. Does your husband sail?
A. No.
Q. Has your husband ever sailed?
THE WITNESS: Ever sailed in what



way?
MR. MUZYKA: On any type of sailboat.
THE WITNESS: As a guest?
MR. MUZYKA: As a guest, owner --
A. No, never as an owner.
MR. MUZYKA: -- crew.
A. I would say maybe two or three times as a guest. He's not an avid sailor.
Q. Does the Port Washington Yacht Club have any other sports other than sailing?
A. Yes.
Q. What are the other sports?
A. Tennis, paddle tennis, skeet shooting. They have swimming.
Q. Do you participate in any of those sports?
A. No.
Q. Does your husband?
A. Yes.
Q. What does he participate in?
A. Tennis and paddle tennis.
Q. Is he ranked?
A. No. He should be. He's very good.
Q. What are you -- do you use the Port Washington Yacht Club at all?



A. Only for dinner once in a while.
Q. When you were a child, did you ever take any type of training or course in boating or sailing?
A. No.
Q. In the ten years prior to 2004; in other words, from 1994 to 2004, how many times have you been out on any type of boat?
THE WITNESS: Including my family's water skiing boat?
MR. MUZYKA: Yes.
A. In ten years not very many. Maybe ten times. Once a year. I'm not a boater.
Q. In those ten times that you've been out in boats, how much of that was with your family on the water skiing boat?
A. All of it except once.
Q. And what was the other time?
A. The other time was in 2003.
Q. What vessel were you out on?
A. We were on a charter boat in Newport, Rhode Island.
Q. Was it a sail or motor?
A. Sail.



Q. Was It a 12 meter?
A. Yes.
Q. What was the name of the boat?
A. I believe it was the AMERICAN EAGLE.
Q. Was it with the Port Washington Yacht Club?
A. Yes.
Q. Do you recall when it was that you were on board that in 2003?
A. August.
Q. Do you know the exact date?
A. No, I do not. I would believe it was the end of August.
Q. When you were on the AMERICAN EAGLE at the end of August in 2003, that was again with this outing from the Port Washington Yacht Club; is that correct?
A. Yes.
Q. When you were on the AMERICAN EAGLE, who was with you?
A. My husband, my daughter, and members of the Port Washington Yacht Club.
Q. What is your daughter's name again?
A. Kelly.
Q. What is your son's name?

Page 77

we were on the AMERICAN EAGLE, the crew was so professional and two strong men were assisting this captain. I was very surprised to -- I couldn't understand how these two young girls were going to sail this boat.
Q. Did one girl look qualified to you?
A. One looked -- one seemed to be more knowledgeable than the other.
Q. And the only other time that you had been on a sailboat with a crew that operated it was the AMERICAN EAGLE?
A. Yes.
Q. Now, you had mentioned the statement that because of this young girl crew, that your husband and Steve had to assist on the main deck; isn't that correct?
A. Yes.
Q. Weren't they invited to come up and assist?
A. They may have been invited, but whether they were invited or not invited, they needed their help.
Q. How do you know they needed their help? You're not a sailor. I'm trying to find this out.
A. No, I'm not a sailor. Just from observation. I

Page 78

was just watching and I didn't think they were strong enough to handle this boat.
Q. Wasn't this cruise advertised as a sailing hands-on cruise where the people who came on board the boat could actually take part and participate?
A. No.
MR. BARRY: Objection to the form.
Q. It wasn't?
A. No. Absolutely not.
Q. And if someone would testify that's what it was, you would disagree with them?
A. Yes.
Q. When the vessel left the dock and everyone was on board, was any safety warning given by Captain Barrows?
A. No.
Q. None whatsoever; is that your testimony?
A. Yes.
Q. Now, that would be different from what you experienced the year before on the AMERICAN EAGLE; is that correct?
A. This was a totally different trip.
Q. Did your husband ask Captain Barrows any

Page 79

questions when he boarded the vessel?
A. I don't remember.
Q. Did you ask Captain Barrows any questions when you boarded the vessel?
A. No.
Q. So, as I understand it, the vessel got underway from the pier and was going out into the harbor. Was it motoring out by engine?
A. I don't really remember.
Q. Are you having any problem with recalling what happened in August of 2004?
A. No, but I'm not a boater. So -- and I wasn't, you know -- I guess I wasn't paying attention. Was he using his motor? Was he using his sails? I really don't know.
Q. Do you recall the sails being put up at any time?
A. I remember them going up, yes.
Q. From the time the vessel left the pier until the time the sails went up, was there any safety warning given to anybody by Captain Barrows?
A. No.
Q. Was there any type of safety lecture given?
A. No.

Page 80

Q. Did he give any type of introductory lecture about the boat, about what was happening and what was going to occur?
A. I don't remember. I certainly didn't hear it if he did.
Q. At that point where were you just before the sails went up?
A. When the boat went out, I remember settling -- I don't know the exact terms for boats, for the area, but there was kind of like a -- the steering wheel was to the right of me and I was kind of leaning back against the boat.
Q. Would you agree with me that there's a cockpit in front of the steering wheel?
THE WITNESS: With a seat?
MR. MUZYKA: No. There is an opening, a box in front of the --
THE WITNESS: Right in front of the seat?
MR. MUZYKA: But not with a seat.
A. Right.
Q. Is that correct?
A. Yes.
Q. And you were in that cockpit area?

and forth; is that correct?
A. Yes.
Q. When the HERITAGE was tacking back and forth, would Captain Barrows issue a voice command about the tack before the tack happened?
A. Yes.
Q. So, he would say -- what would he say, if you recall?
A. I don't recall.
Q. It would be something to the extent about coming about?
A. Uh-huh.
Q. Yes?
A. You have to watch your head (Indicating).
Q. And once he would give that command, the next thing would be that the sail would move from one side of the boat to the other; is that correct?
A. Yes.
Q. And you saw that on a number of occasions?
A. Uh-huh.
Q. Before the vessel started racing, did Captain Barrows show to the Port Washington people on board how the vessel would tack by turning on a coming about and by jibing?



A. I don't recall. By showing, what do you mean showing?
Q. By making the vessel move, going, turning to the left, turning to the right?
A. No. Not that I recall.
Q. Now, when your husband was on the fore deck or the main deck of the vessel, what was he doing to assist in sailing?
A. He was doing something with the sails. I wasn't really watching him.
Q. What were you watching when you were out on the boat?
A. I was looking out on the water. And actually, at one point, when the weather had gotten really bad, I noticed this boat, when we had just completed a race. I looked across, and it was pouring rain, all these people had life jackets on and rain gear and someone made a comment like, oh, my gosh, look at them. They're all wearing life jackets. And I remember thinking, yeah, we're the fools sitting here without life jackets on in this weather. So, I mean, basically, I was looking out on the water. I really wasn't...



Q. When the boat came about during the three or four races, did you ever look at the lines, how they were moving on the deck?
A. Never.
Q. Did you always stay on the left side of the boat?
A. No. When it had come about, I went over to the other side. I went to the other side.
Q. So, as the boat came about, you would move to either the right side or the left side, depending on which side the sail was on; is that right?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. Do you know why you were moving from one side of the boat to the other?
A. For the weight.
Q. Did anybody ever tell you to move from one side of the boat to the other?
A. Uh-huh.
Q. Who?
A. I mean, the people who were on the boat. We'd all get up and we would move, whoever was next



to me.
Q. Did Captain Barrows ever tell you to move over to one side or the other?
A. I don't recall if he made a direct -- I mean, if you didn't move, you'd get hit in the head with the sail or the boom.
Q. When you would move from one side of the boat to the other, which side would you move to, the side with the sail or the side that was -- that didn't have the sail?
A. I don't recall.
Q. When you moved from one side of the boat to the other, did you move to the side that was closest to the water or the side that was higher, away from the water?
A. Higher, away.
Q. If I suggested to you that was the side opposite where the sail was, would that refresh your recollection?
A. No.
Q. During the time that the vessel was racing, is it -- I have the understanding that you never looked at any of the lines that controlled the sails; is that correct?

A. Yes.
Q. At any of the times that the vessel was racing, did you ever look at the pulley system on the vessels's deck to see how they were being worked?
A. Never.
Q. Would it be fair to say that during the time that you were on the vessel, while it was underway and sailing and racing, that your whole focus was off the vessel and not on anything happening on the vessel; is that correct?
A. Absolutely.
MR. BARRY: Objection to the form.
A. For me, it was a pleasure cruise.
MR. BARRY: Lynn, wait for a question.
Q. At any time, when the vessel was racing, were you ever concerned for your own safety?
A. Yes.
Q. What concerns did you have for your safety?
A. The winds, the rain. The fact that we didn't have life jackets. It was really getting dangerous. The boat was tipping. There seemed to be a lot of, you know, the one girl talking to the other girl. She didn't know what she was



doing. The other girl giving her instructions. My husband was up there helping out. It just seemed like a lot of confusion.
Q. At any point during the trip, did you ever complain to the captain that the boat was in a state of confusion and you were concerned for your safety?
A. No.
Q. Did you ever complain to the captain that his crew weren't experienced enough to sail the vessel?
A. No.
Q. Did you ever complain to the captain about how the boat was tipping?
A. No.
Q. Did you ever complain about the weather to the captain?
A. No. Not to the captain, but I think we all talked about it.
Q. Amongst yourselves?
A. Uh-huh. I'm sure he overheard it.
Q. Do you know if he heard it?
A. No, but I mean he was there.
Q. Did you ever ask the captain for a life vest?



A. No.
Q. Why not?
A. It's a very good question.
Q. You're concerned for your own safety, are you not?
A. Absolutely. And my children.
Q. Did you ever ask for a life vest for your children?
A. No.
Q. When you say during the race that the wind was blowing, how fast was the wind blowing from when they put up the sails? Did it increase?
A. Oh, yeah. Definitely as the weather progressively got worse or worsened, the winds got better -- got worse.
Q. Did anybody ask the captain to go back to port because it was just a very uncomfortable trip to be out there in the wind and rain?
A. I vaguely remember them just talking about maybe doing another race and then some of them talking about maybe we should go back, something like that. That's vaguely.
Q. When you say "them," who are you referring to?
A. I don't know. People on the boat. I wasn't



really -- you know, I wasn't really involved in the sailing at all. I was just a guest.
Q. Did you have anything to drink by way of alcoholic beverage that day before your injury?
A. No.
Q. At the time of your injury was the vessel racing?
A. At the time of my injury, I believe that we had just completed a race.
Q. So, the three or four races had concluded. What was the vessel doing at the time of your injury?
A. What exactly happened?
Q. No. No. Was the vessel going back to port? Was it sailing around the harbor?
A. No. We were still out in the harbor. We had not turned back yet.
Q. Do you know where the vessel was at the time of your injury other than being in Narragansett Bay?
A. No.
Q. Were you close to any type of shore structure, lighthouse, hotel, pier? Anything like that?
A. No.
Q. Of the individuals who were on board the

careful not to put anything in them, get clothing caught, jewelry, hair, anything.
Q. Did you learn this from the AMERICAN EAGLE's safety announcement?
A. I remember him just going over things, just to stay clear of, not to wear jewelry, things like that, but no. I mean, I've since obviously talked a lot about safety issues on boats, on sailboats since my accident.
Q. So, you've learned all this since your injury; is that correct?
A. Right. But my only prior experience being on a boat was with the AMERICAN EAGLE. And he was very aware that if I were not a sailor -- since I was not experienced, he was very aware of that and very aware of people who did not have sailing experience. He was quick to point out, well, you know, since you don't have sailing experience, you sit here because this is going to be the most comfortable place for you.
Q. When you were on the HERITAGE, did you tell Captain Barrows you did not have sailing experience?
A. I did not, but Joan McGinnes did.



Q. She said you didn't have --
A. She told him that some of us were sailors and that there were some people on the boat, I don't know whether she went through our names or pointed us out to him, but she did tell him there were some people on the boat that were not experienced sailors.
Q. Having had the experience on the AMERICAN EAGLE the year before, did you go up to the captain and say, look, I'm an inexperienced person, where's the best place for me to sit or stay on the boat?
A. I did not.
Q. Now, you've told me that you have no sailing experience, but if you had looked at the lines going into this block or this pulley system, the turning block as they call it, and you saw the lines moving in and out, you would have known that if you put your hand in there, that that would have caused damage to your hand; isn't that correct?
MR. BARRY: Objection.
A. Anyone looking at that, in looking at it and watching the lines, would see that if you put



your hand in there, it could cause significant damage. I didn't see it obviously when I leaned back and placed my hand on the boat. I didn't see it. And I certainly, knowingly would not stick my hand in a winch.
Q. I appreciate that. But what I'm asking you is, during the time that you were on the HERITAGE, I believe you told me that you never looked at the lines and never looked at the winch or the block?
A. I didn't. I didn't give it any thought.
Q. Wouldn't it be prudent for a person who doesn't have any experience to look around the deck to see what moves and doesn't move so you don't get your hand or any other part of your body caught in any of the moving objects?
MR. BARRY: Objection. You can answer.
A. Unfortunately, I never, ever thought of it or imagined that such a thing could happen.
Q. Before coming on the boat, did you ask anybody at the Port Washington Yacht Club who was in this 40-member group about what they would consider to be safe and what you should do on



board the boat?
A. No.
Q. So, as I understand your testimony, once you got on the HERITAGE, you didn't take any precautions whatsoever with regard to the block, meaning the pulley system, or the lines that were on the main deck?
A. No, I did not. It was never brought to my attention.
Q. But you would agree with me, if you looked at it and you saw the lines moving in and out of the block, you would not put your hands in it?
A. No one would put their hands in that mechanism. Why would anyone deliberately put their hand in that mechanism?
MR. BARRY: Don't ask questions, answer questions.
THE WITNESS: Okay.
Q. With regard to the fact that you were thrown across the boat from the left side to the right side, did you ever report that to anybody?
A. Well, initially, I was rescued by the Coast Guard.
Q. I appreciate that. Did you tell the Coast Guard

could I have worked until I was 65? Why not, as long as I was healthy.
Q. How old is your husband today?
A. Fifty-one.
Q. Would you definitely retire when he retires?
A. He's never going to retire.
Q. You never know, he might hit Megabucks.
A. He's not the retiring type.
Q. At any point in time did you make any determination as to how long you were going to work?
A. No.
Q. Did you plan on working until 65?
A. Definitely. I mean, I really enjoyed what I did.
MR. MUZYKA: I don't think I have anything else. Now, I'm not closing the deposition because there are some interrogatories that I mentioned to Pat at the beginning that are unanswered, such as the amount of damages she's claiming in this lawsuit, to the extent that those are going to be supplemented. If they're different, then I'm reserving the right to redepose her concerning



those issues.
MR. BARRY: I just note that we did discuss that briefly before the deposition when I arrived today. John Foley has been the primary attorney on this case. Understanding what you want to do and the reasons for it, I think that's probably fine, but I can't make a personal commitment to have her reappear just yet. I'll talk with John about it. I don't think it will be a problem and it will only be an issue if anything arises from supplemental answers.
MR. MUZYKA: Other than that, we're done.
(DEPOSITION SUSPENDED AT 1:55 P.M.)



CERTIFICATE

I, the undersigned, LYNN MATTHEWS-SUTHERLAND, do hereby certify that I have read the foregoing deposition taken on July 11, 2006, and that it is true and correct to the best of my knowledge, information, and belief (with the exception of the following corrections listed below):

| Page | Line | Correction |
|---|---|---|
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |

Signed under the pains and penalties of perjury this _____ day of ___________, 2006.

_________________________
LYNN MATTHEWS-SUTHERLAND



COMMONWEALTH OF MASSACHUSETTS

I, BARBARA M. MONTIJO, RPR, a Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing deposition was taken before me on the day herein set forth;

That the witness named in the deposition, prior to being examined, was by me first duly sworn;

That said deposition was taken before me at the time and place herein set forth, and was taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

That said deposition is a true record of the testimony given by the witness and of all objections made at the time of the examination.

I further certify that I am neither counsel for nor related to any party to said action, nor in any way interested in the outcome thereof.

IN WITNESS WHEREOF, I have subscribed my name and affixed my seal.

_________________________
Barbara M. Montijo, RPR
Notary Public
Massachusetts
My Commission Expires:
1-12-2007.