**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

**CIVIL ACTION**
**NO. 05-450-S**

**LYNN M. SUTHERLAND**
**Plaintiff,**

**vs.**

**HYC, INC. AND JEFFREY BARROWS**
**Defendants.**

**DEFENDANTS' PRETRIAL MEMORANDUM**

This matter involves a maritime personal injury action against the Owner and Master of the S/Y HERITAGE, a 12 Meter Yacht that was chartered out of Newport, Rhode Island.

On August 21, 2004, the plaintiff, Lynn Sutherland, was a passenger on the 12 Meter Yacht HERITAGE, owned by defendant HYC, Inc. The defendant, JEFFREY BARROWS, was the vessel's Master. During the charter cruise, the plaintiff suffered a hand injury, resulting in a partial amputation of one finger and injuries to two other fingers on her right hand. The plaintiff maintains that the defendants failed to warn her of a dangerous condition. The defendants maintain that such dangerous condition, if one existed, constituted an "open and obvious" condition

for which there was no duty to warn. The defendants, in the alternative, argue that appropriate warnings were issued satisfying any requirement alleged by the plaintiff.

## I. DEFENDANTS' EVIDENCE

1. JEFFREY BARROWS-FACTUAL

Defendants will present the testimony of Captain Jeffrey Barrows. He was the vessel's Master on August 21, 2004. He also was the President of HYC, Inc. He will testify as to his ownership of the S/Y HERITAGE. HYC, Inc., a New Hampshire corporation, purchased the vessel in 1991.

He will testify to the operation of the vessel, in general, and on the date of the injury. In 2004, he was the Master for the majority of the charters. When he was unavailable, Frank Lotito would be the Master. The vessel operated with two crewmembers. He will also testify that the vessel was U.S. Coast Guard inspected and had a Certificate of Inspection that it complied with all required safety regulations.

He will testify about his observations and actions during the charter in which the injury occurred. The charter was by the Port Washington Yacht Club and was for the period 1300 hours until 1700 hours on August 21, 2004.

His two crewmembers were Cedar Poirier and Emily Labnon. Both had been with him for the charter season. He will specifically testify as to the safety orientation speech as required by the U.S. Coast Guard regulations and was given by him shortly after the vessel departed the dock. He gathered the passengers in the cockpit area and advised that because of the winds that day they would only be using the jib sail, he advised as to the location of the head, refreshments, and the life preservers. He pointed to the jib winches on the deck and advised the passengers to be respectful of the winches and lines and to watch where they placed their hands and fingers. Then the crew took those who were going to participate in the operation of the vessel as "grinders" and instructed those passengers in their responsibilities. He recalled the plaintiff asking a question about her son, Matt Sutherland, because he had his arm in a sling from an unrelated incident. For the most part the plaintiff sat in the same spot during the entire charter. He will testify as to the U.S. Coast Guard regulations applicable to the operation of the S/Y HERITAGE.

He will testify about his observations at the time of the incident and the actions that he took in response to the injury to the plaintiff. After the racing had

concluded the vessel was sailing in the vicinity of Jamestown. It became apparent that a maneuver would be required because they were approaching the shore and head the vessel in an easterly direction back towards Newport Harbor. The normal procedure was followed to announce the tack. He did not see where the plaintiff had her right hand due to other passengers in the cockpit. As the vessel was about head to wind, he heard someone scream. He turned the vessel to keep the bow into the wind, taking the pressure off the line. He will specifically testify that no equipment failed at the time of the incident and that no actions by the crew or omissions by the crew caused the plaintiff's injury.

He will testify as to the rigging on the vessel and the mechanics of the vessel maneuvers and the number of times that the vessel performed tacks and jibes during the charter.

He will also testify as to the actions taken to return to port. He immediately contacted the U.S. Coast Guard and arrangements were made with the harbormaster to transfer the plaintiff to the harbormaster's boat in order to facilitate getting plaintiff to the hospital in the most efficient manner possible.

2. CEDAR POIRIER-FACTUAL

Cedar Poirier was the First Mate on the S/Y HERITAGE on August 21, 2004. She will testify by video deposition as to her extensive experience in the 12 Meter chartering industry and her observations of Captain Barrows. She began working on 12 meter yachts at the age of 16 and had over 10 years experience at the time of the incident. In 2003, she was the First Mate on the S/Y HERITAGE. Emily Labnon was the other regular crewmember. At the time of the incident, Emily Labnon was very experienced in the vessel's operation. She will also testify that Captain Barrows was a very competent Captain.

She will testify as to the charter in which the plaintiff was injured and her observations of the plaintiff and the other charter guests. She will also testify as to the warnings that were given by Captain Barrows at the commencement of the charter. She specifically recalled Captain Barrows giving the required safety warnings shortly after the vessel departed the dock. This safety speech included a warning that the passengers keep their hands clear of any moving lines. She will testify that even if the passengers were not aware to keep their hands away from the turning blocks, after three hours of sailing the passengers should have

been aware of that fact because of the number of tacks and gybes that were performed during the race.

She will also testify as to her observations of the incident and the actions taken by Captain Barrows subsequent to the incident. On that day, the main sail was not used due to the weather conditions. Only the jib sail was used. She will testify that the procedure to perform a tack was for the Captain to call out “Ready about”. That signaled her to prepare the forward deck, including getting the “grinders” in place. Once ready, she and Emily would respond “Ready forward”. Then, when the actual maneuver was initiated, Captain Barrows would call out “Helm over” and the wheel would be turned. This procedure was followed every time, including the time in which the Plaintiff was injured.

She will testify that she did not see where plaintiff’s hand was positioned immediately prior to the tack. Shortly after the maneuver commenced, she heard someone scream and instructed Ms. Labnon to cease and observed Captain Barrows turn the vessel into the wind, thereby taking the strain off the line.

3. PLAINTIFF LYNN SUTHERLAND-FACTUAL

Defendant anticipates that plaintiff will testify in her case in chief. Defendant anticipates that her evidence will show that she had been employed as an interior designer with her mother in Mary Mathews Interior Designs. They parted company in a dispute and plaintiff began her own firm, Matthews Sutherland Design Associates, Ltd. in 2003, over a year before the incident. She entered into a partnership with Smiros & Smiros, earning commissions at significantly less money.

Plaintiff had been on a charter the year before on the S/Y AMERICAN EAGLE, another 12 Meter yacht that charters out of Newport. Additionally, the charter of the S/Y HERITAGE lasted approximately 3 hours and involved from 15-60 tacks and gybes. Every tack and gybe involves the sail moving from one side of the vessel to the other, which necessitates the jib sheet (the rope from the grinder to the sail) moving through the turning block in which the incident occurred. Further, there are two turning blocks, one on the starboard (the one in which the incident occurred) and an identical one on the portside. Besides being visible on either side of the vessel, the turning blocks also can be heard vocally when the sheet travels through the block, further disputing that the

plaintiff had to be aware of the turning block prior to the accident.

The evidence will further reveal that no equipment on the vessel failed and that no actions of the crew caused the plaintiff's injury. The evidence will also reveal that the normal procedure was followed when the tack in which the incident occurred. She was aware that a tack was about to occur. At no point during the sail did the plaintiff complain about any condition on the vessel.

She will also testify that some time after the incident she sought psychiatric treatment with Dr. Galetta. She only saw him a couple of times and does not feel psychiatric or psychological therapy is needed.

4. EMILY LABNON-FACTUAL

Emily Labnon is a 22 year old crewmember aboard the S/Y HERITAGE at the time of the incident. She is presently enrolled in a Master's Program in Marine Biology at the University of Queensland in Australia. She is anticipated to testify by videotape unless she is available to testify live at trial. She has been sailing since she was eight years old and began on the S/Y HERITAGE in June, 2004. As of the date of the incident, she had been on at least 25 charters and was familiar with the operation of the vessel. She and First Mate Cedar

Poirier were the regular crewmembers on the vessel that summer.

She recalled the charter in which the incident occurred. Her recollection was that there were four vessels racing and, for the most part, the plaintiff remained in the cockpit area the whole time. She estimated 2½ hours of sailing from the beginning until the incident. She estimated approximately 20 tacks that day before the incident. The winds were 25 knots and they were only using the No. 4 jib, and not the main sail.

At the time of the incident, she was releasing the jib sheet on the starboard side. She did not see where the plaintiff had her hand immediately prior to the incident. The plaintiff was seated inboard of the starboard turning block. By that time, the racing had concluded and the normal procedure for a tack was followed. As the sail was going across, it stopped and plaintiff began screaming. She immediately began wrapping the line around the drum to release the tension on the line. She observed the plaintiff's hand in the turning block. She observed the severed finger knocked into the water by the luffing sail and sheet.

Captain Barrows instructed her and Cedar Poirier to take down the sail and the vessel motored towards Newport

as fast as the vessel was capable. Cedar Poirier provided ice to the plaintiff. The harbormaster's motor launch met the S/Y HERITAGE at the entrance to Newport Harbor and plaintiff was transferred.

She will also testify as to the safety orientation speech by Captain Barrows. Shortly after the vessel departed the dock, Captain Barrows conducted the safety briefing in the cockpit. He advised that only the jib sail would be used, the location of the head and life jackets and he advised the passengers to watch out for moving lines. She did not specifically recall Captain Barrows mentioning the turning blocks or winches, but she did indicate that such warnings were typical for him if they were being used.

5. JOAN MACINNES-FACTUAL

Joan MacInnes was a passenger on the S/Y HERITAGE at the time of the incident. She and her husband Duncan MacInnes live in Beverly, Massachusetts, although they formerly lived in Port Washington, New York and remained members of the Port Washington Yacht Club.

They attended Newport and boarded the vessel at 0900 or 1000 hours. The crew of the S/Y HERITAGE was blond and very efficient. She recalled that Captain Barrows did conduct a safety orientation speech, although she did not

recall there being any mention of the turning blocks or the lines. She will testify about the procedure for announcing a turn and will testify that the Captain was very good about making such announcement. All announcements were loud enough for all aboard to hear, including the announcement of the tack in which the incident occurred.

She estimated the wind at 20MPH. It was a nice day with no rain. The vessel performed well over 20 tacks prior to the incident. She was aware that the lines on both sides of the vessel would move at each maneuver, based upon her experience and based upon the noise that the lines would make as they traveled through the turning block. To her knowledge, plaintiff never left the cockpit area and she did not recall the plaintiff switching sides at any time.

At the conclusion of the racing, there was still some time and the passengers were taking turns at the helm. The vessel came about and the plaintiff started screaming. She was a nurse, so she immediately went to her aid. She had not observed where plaintiff had her right hand immediately prior to the incident.

No equipment failed at the time of the incident and nothing the crew did caused the plaintiff's injury.

6. DUNCAN MACINNES-FACTUAL

Duncan MacInnes was also a passenger on the S/Y HERITAGE at the time of the accident. He recalled Captain Barrows giving a safety orientation speech. He recalled the plaintiff being seated for the charter on the starboard side in the cockpit and was still in that position at the time of the accident. Mr. MacInnes was seated across from the plaintiff on the portside. Mr. Stearns was at the wheel with Captain Barrows directly beside him. He was aware that a maneuver of the vessel was about to occur, both from the announcement by the helmsman and the location of the vessel heading towards land or rocks. He observed the plaintiff seated, but did not observe where her hands were located. As the turn proceeded, he heard someone scream. He did not immediately realize what had happened until his wife jumped up and started pulling on the jib sheet. He got up and assisted his wife. Captain Barrows immediately assumed the helm and turned the vessel into the wind, taking the strain off the line. It took approximately 8-10 minutes, with the vessel motoring at full speed, to reach the entrance to Newport Harbor where the plaintiff was transferred to the harbormaster’s skiff. He will

testify that no equipment failed on the vessel and that he did not see anything improper done by the crew.

7. ROBERT STEARNS, JR.-FACTUAL

Mr. Stearns was the helmsman at the time of the accident. He is a resident of Port Washington, New York and was aboard the vessel on August 21, 2004 with his daughter Lindsey. He did not recall any safety briefing that day, but did recall mention of mock racing and that only the jib sail would be used that day. He recalled there being at least 30 tacks that day prior to the incident. He will also testify that for each tack the same procedure was followed: announcement of upcoming maneuver, response by crew, and then announcement of maneuver. He and plaintiff’s husband, Jack Sutherland, were the “grinders” that day. His recollection of the plaintiff was that she remained seated on the starboard side of the cockpit the whole charter. After the mock racing portion of the charter was completed, he was offered the opportunity to take the helm, which he did. The vessel was heading downwind at a leisurely pace towards Jamestown. Beside him was Captain Barrows. They agreed that it was time to tack. He made the announcement and the crew responded. Prior to turning the wheel, he announced “hard alee” and turned the wheel. About half

way through the tack, he heard plaintiff scream "Wait, my hand is caught." He did not see the location of Plaintiff's hand prior to the initiation of the tack. Upon hearing plaintiff, he turned the wheel opposite, putting the bow into the wind to take the strain off the line. Once plaintiff's hand was freed, Captain Barrows took the helm and started the engine. The vessel motored towards Newport as quickly as possible while Captain Barrows was hailing the harbor patrol. He will testify consistent with all witnesses that nothing failed on the vessel that led to plaintiff's injury. He also will testify that there was nothing that Captain Barrows or the crew did that caused plaintiff's injury. He will also testify that it would not be good seamanship to hold onto the jib sheet.

8. ROBERT HODSON-FACTUAL

Mr. Hodson is a member of the Port Washington Yacht Club and was on the charter on August 21, 2004 with his wife and daughter Molly, age 15. Prior to the departure of the S/Y HERITAGE, Captain Barrows did a safety orientation speech, pointing out where the life jackets were and that they would only be using the jib sail that day. He estimated that during the day the vessel did at least 12 tacks and possibly a couple of gybes. Most to

the time, he was in the stern with the plaintiff's son, Matt Sutherland. He recalled plaintiff being seated in the cockpit on the starboard side for the charter. At the time of the incident, the vessel was heading towards Jamestown. He was aware that a tack was about to be performed, having heard the announcement from Captain Barrows and also from Mr. Stearns. Just after the command "hard alee" was given the vessel turned and plaintiff started screaming. He was not aware of the location of her hands prior to the commencement of the tack. Captain Barrows took the helm right away and turned the vessel into the wind, contacted the harbormaster and started the main engine. He will testify that no equipment failed on the vessel or that any actions or omissions by the crew caused the plaintiff's injury.

9. GEORGE BOULUKOS-FACTUAL

He was the former Commodore of the Port Washington Yacht Club and attended the charter with his wife. He was a former marina owner and has extensive sailing experience. He will testify that the S/Y HERITAGE was well maintained and was wonderfully equipped. Once he and his wife boarded the vessel, Captain Barrows went though a safety briefing. During this, he introduced the crew, explained the day ahead and advised that only the jib sail

would be used that day. Captain Barrows explained how the sails would be hoisted and the typical maneuvers expected that day. He recalled Captain Barrows explaining that for each tack one sheet would be released and one taken up. He did not specifically recall a warning about keeping clear of lines and the block, but admitted that such warning could have been included.

He will testify that he took the helm for some portion of the racing, with Captain Barrows directly to his side. He will confirm the usual procedure for each tack was followed and that no equipment failed at any time during the charter. At the time of the incident, he was not at the helm, but was at the stern with Robert Hodson and Matthew Sutherland. He was aware that a tack was forthcoming, but did not observe the position of plaintiff or her hands immediately prior to the incident. He recalled there being numerous tacks during the day.

He also was not aware of anything that Captain Barrows or the crew did to cause the injury to plaintiff.

10. KATHARINE BOULUKOS-FACTUAL

Mrs. Boulukos was aboard the charter with her husband. She recalled Captain Barrows giving a safety briefing at the commencement of the charter and specifically mentioned to be careful of the winches and

lines and to keep hands inside the vessel. She recalled that Captain Barrows went over everything very generally.

She will confirm that the procedure for announcing a tack was followed on each occasion and that the sound of the sheet going through the turning block on each occasion would be audible.

After the racing concluded, she was in the cockpit talking and was aware that a tack was forthcoming. She did not observe the location of the plaintiff's hands, but admitted that it would not be a good practice to be holding onto the lines. She will also confirm that no equipment failed and that there was nothing that Captain Barrows or the crew did that caused the injury to plaintiff.

11. KELLY SUTHERLAND-FACTUAL

Kelly Sutherland is the daughter of the plaintiff. She was 14 years old at the time of the charter. She mostly remained near the stern of the vessel during the charter with Molly Hodson and another female guest. She recalled that there were a number of tacks that day and that the procedure of announcing the tack was followed. She will testify that her memory of her mother that day, before the incident, was being seated in the cockpit area on both the port and starboard sides. When she heard her

mother scream, she turned and saw her mother's hand in "something metal", with the top of her hand parallel to the deck.

12. DAVID DUBOIS-EXPERT

Mr. Dubois is a former Marine Safety Officer with the United States Coast Guard and has been the President of Marine Safety Consultants since 1980. He will opine that the S/Y HERITAGE is an inspected vessel and that it met all requirements of the United States Coast Guard as a passenger carrying vessel. He will also opine that the turning blocks on the S/Y HERITAGE are in compliance with all Coast Guard regulations and are not an "exposed hazard". He will also opine that the safety briefing as testified to by Captain Barrows and the crew was in compliance with 46 CFR §185.506. He will also testify that the procedures employed by the crew that day were prudent.

He will testify consistent with his report and deposition.

13. JAMES SMIROS-FACTUAL

James Smiros is a principal in Smiros & Smiros, an architural firm. They entered into a joint venture with the plaintiff and her interior design firm prior to the incident. He will testify as to the compensation

arrangements with the plaintiff, consistent with his deposition testimony.

14. HERBERT MARSHALL—FACTUAL

Captain Marshall is the Captain of the S/Y AMERICAN EAGLE, the vessel that the Sutherland family was on the year before the incident. He will testify as to his practice and procedure for the safety briefing and the warnings that he gives to the passengers aboard the S/Y AMERICAN EAGLE.

15. KRISTIN ANDERSON—FACTUAL

Kristin Anderson was one of the physical therapists treating the plaintiff. She will testify as to her treatment of the plaintiff, the plaintiff's attendance at the physical therapy sessions, and the reason for discharge of the plaintiff.

16. DR. EDWARD NALEBUFF—EXPERT

Dr. Nalebuff will testify as to his examination of the plaintiff at the request of the defendant. He will render opinions consistent with his reports. He will opine, inter alia, that the plaintiff has a 45% loss of function in her right hand and that further surgery is not appropriate.

17. DEBORAH VEATCH—EXPERT

Deborah Veatch is a vocational expert. She will testify that no physician has found the plaintiff totally disabled. She notes that the plaintiff has kept up with the interior design field. She will opine that the plaintiff is ready to return to the work force as an interior designer and that within 1-2 years will return to full earning capacity.

18. PETER ASHTON—EXPERT

Peter Ashton is an economic expert. He will dispute the plaintiff's claimed loss. He notes the failure of the plaintiff's expert to consider the post-2002 earnings from Smiros & Smiros when the plaintiff began her own business. Mr. Ashton will opine that the total loss of the earning capacity, past and future, for the plaintiff is at the level of $205,859.00

19. ALBERT KING, PHD-EXPERT

Dr. King is a biomechanical engineer. He will testify as to the mechanics of the accident based upon his review of the deposition testimony, review of the medical records and his examination of the turning block. He will opine that the accident happened because the plaintiff was holding onto the sheet as her hand was drawn into the turning block. He will also dispute the opinions of Dr.

John Lenox. He will testify consistent with his report and deposition.

20. WILLIAM JENKINS—EXPERT

William Jenkins will testify as to the value of the S/Y HERITAGE on the date of the incident. He will testify that the vessel had a value for purposes of Limitation of Liability at the level of $95,000-135,000.

## II. LEGAL MEMORANDUM

Plaintiff's sole claim of negligence is that Captain Barrows or the crew failed to warn the plaintiff about the turning block and to keep hands clear of the lines.

As a passenger carrying vessel, U.S. Coast Guard regulations require that a passenger safety orientation announcement be made before getting underway or as soon as practicable thereafter. 46 CFR § 185.506. It does not require a warning about the lines and/or turning blocks.

The witness testimony has been varied on the content of the safety speech provided by Captain Barrows. Captain Barrows testified that the required safety announcement was given shortly after the vessel left the dock. The passengers were gathered around the helm in the cockpit. He advised 1) that because of the weather they will only be using the jib sail and not the mainsail, 2) the location of life preservers and the head, 3) the operation

of the head, 4) the sailing agenda for the day, and 5) he warned the passengers to be mindful of the lines and winches.

Mate Poirier had a specific memory that Captain Barrows advised the passengers not to hold on to the running lines because they run through the “sheaves”. She did not recall Captain Barrows specifically indicating to the passengers not to put their hands on the turning block, but testified that this should have been apparent after 2-3 hours of sailing and that such warning was not necessary where the passengers were already told not to handle the lines.

Crewmember Emily Labnon did not recall whether the safety speech included any mention of the winches, but she did recall him advising the passengers to watch out for moving lines. She also testified that it would not be a good practice to hold onto a line even if the line was not moving.

The testimony of the passengers was not uniform. Most remembered there being some type of safety speech. Ms. Katharine Boulukos remembered the Captain specifically mentioning the winches and lines. Ms. Joan MacInnes, the nurse who initially came to the assistance of the plaintiff, and her husband Duncan MacInnes did not recall

any safety speech, but the other passengers, including the plaintiff's husband, recalled there being a safety speech, but did not recall mention of being aware of the lines and winches. *All of the passengers testified that none of the vessel's equipment failed and there was nothing that the crew affirmatively did that caused the plaintiff's injury.*

The plaintiff's sole claim of negligence is that Captain Barrows failed to warn the plaintiff about the turning block and to keep her hands clear of the lines. There is no claim that Mate Poirier or Deckhand Labnon was negligent. There is also no claim that the S/Y HERITAGE or its equipment was defective or improper.

The plaintiff has filed a one count Complaint for negligence. In response to Interrogatories, the plaintiff's sole claim for negligence is that the Captain failed to warn the plaintiff "about the turning block and to keep hands clear of it and that the lines were going into it or around it."

The law on failure to warn claims in admiralty is fairly clear. The vessel owner has a duty to exercise ordinary care, including the duty to warn of a reasonably foreseeable harm. *Bubla v. Bradshaw, 795 F.2nd 349 (4th Cir. 1986).* It is well settled that there is no duty to

warn of an open and obvious danger that a reasonably prudent person would take reasonable steps to avoid.

*McMellon v. United States, 395 F.Supp.2nd 422 (S.D.W.Virg.2005),* involved a suit against the United States resulting from personal injuries to boaters when their craft went over a dam operated by the Army Corps of Engineers. Plaintiffs therein alleged failure to warn and the government defended on the basis that the dam was open and obvious. The court noted:

> ***…It is well settled that there is no duty to warn of an open and obvious danger that an ordinary prudent person would take reasonable steps to avoid. The defendant argues that the dam must be open and obvious because the plaintiffs admitted to seeing the dam. However, it is the danger presented by the dam that must be obvious, not the dam itself. The plaintiffs admit they saw the dam as they approached it, but because they believed it to be a bridge, they were unaware of the danger of going over the dam.***

*Id. at 435-436.* Normally, the issue of whether a danger is open and obvious is an issue of fact for the jury. *Maneely v. General Motors Corp., 108 F.3rd 1176 (9th Cir. 1997).* If reasonable minds cannot differ as to the obviousness of danger, the court decides the question as a matter of law. *Hodges v. Summer Fun Rentals, Inc., 2007 AMC 599 (9th Cir. 2006).*

Defendants maintain that a warning was given. Even if the warning was not given, the risk of injury by the

turning block was an open and obvious condition for which a warning is not required. If the jury finds in defendant’s favor on either theory, then the court must enter a judgment in defendant’s favor.

Further, defendant has raised Limitation of Liability as an Affirmative Defense in this matter, pursuant to 46 U.S.C. §30505 (formerly 46 U.S.C. App. §183b). This section allows a vessel owner to limit its liability to the value of the vessel after the incident. See 46 U.S.C. §30505. This can be raised either by a Petition for Limitation of Liability or by raising the issue as an Affirmative Defense. *Langnes v. Green, 282 U.S. 531 (1931).* Generally, where Limitation is raised as an Affirmative Defense, the jury determines liability and the determination of Limitation is for the court. *Lewis v. Lewis & Clark Marine, Inc., 531 U.S. 438 (2001).* Defendant anticipates that this will only entail the testimony of expert William Jenkins as to the value of the S/Y HERITAGE at the time of the incident and possibly Captain Barrows to supplement his testimony before the jury.

## III. LIST OF EXHIBITS

A. The turning block

B. Exhibits from the deposition of the plaintiff

C. Photographs of the S/Y HERITAGE

D. Photographs of the deck of the vessel and the turning block in place on the vessel.

E. Plaintiff’s earning records.

F. Exhibits from the deposition of Joan MacInnes

G. Exhibits from the deposition of Duncan MacInnes

H. Exhibits from the deposition of John Sutherland

I. Exhibits from the deposition of Dr. Robert Hotchkiss

J. Exhibits from the deposition of Matthew Sutherland

K. Exhibits from the deposition of Captain Jeffrey Barrows

L. Exhibits from the deposition of Emily Labnon

M. Exhibits from the deposition of Cedar Poirier

N. Videotaped deposition of Emily Labnon

O. Videotaped deposition of Cedar Poirier

P. Photographs of the S/Y AMERICAN EAGLE

Q. Treatment Records of Kristin Anderson

R. Curriculum Vitae of Dr. Edward Nalebuff

S. Curriculum Vitae of David DuBois

T. Curriculum Vitae of Deborah Veatch

U. Curriculum Vitae of Peter Ashton

V. Curriculum Vitae of Albert King, Phd

W. Photographs taken by Albert King, Phd

X. Curriculum Vitae of William Jenkins

Y. Deck diagram of the S/Y HERITAGE

Z. NOAA Weather Records

AA. Exhibit from Deposition of James Smiros

BB. Vessel Certificate of Inspection

## IV. MOTIONS TO DISMISS DEFENDANT AND IN LIMINE

The defendants anticipate filing a Motion to Dismiss Jeffrey Barrows as a co-defendant. The motion is premised on the fact that in his personal capacity he is neither the owner nor the operator of the S/Y HERITAGE and as a matter of law is not a proper defendant.

Defendant anticipates filing the following Motions in Limine:

1. Motion in Limine re: after modifications

2. Motion in Limine re: use of USCG Report and reference to any exhibits to the USCG report

3. Motion in Limine re: use of photographs from operating room

4. Motion in Limine re: Dr. Feldman economic testimony as unreliable because he ignores 1½ years of

actual earnings by the plaintiff when she formed her own business before the accident

5. Motion in Limine re: opinions of Dr. Schuster that are not contained within his report

6. Motion in Limine re: opinions of Dr. Lenox. He testified in his deposition that he had no opinions as to how the injuries occurred and the mechanics of plaintiff’s hand came to be drawn into the turning block. His opinion that the plaintiff had her hand on the block immediately before the incident is factual and/or not the subject of expert testimony

7. Motion in Limine re: prohibit the mention of value for pain and suffering in the opening and/or closing

8. Motion in Limine re: the testimony of the plaintiff’s spouse and children as to the plaintiff’s pain and suffering as being cumulative

9. Motion in Limine re: no other basis for liability other than failure to warn

10. Motion in Limine re: opinions of Patrick Derry as irrelevant.

Defendant anticipates filing the Motions in Limine by April 4, 2008.

## V. JURY INSTRUCTIONS AND SPECIAL VERDICT FORM

These have been separately filed.

**VI. ANTICIPATED LENGTH OF TRIAL**

Defendant anticipates the matter will take nine (9) trial days assuming a 0900-1600 trial schedule.

**VII. ADDITIONAL MATTERS**

Defendant is not aware of any additional matters that will aid the court at this time.

Respectfully submitted,
By their attorneys,

**CLINTON & MUZYKA, P.C.**

“/S/Robert E. Collins”
**Thomas J. Muzyka**
**Pro Hac Vice**
**Robert E. Collins**
**RI BAR NO: 2951**
One Washington Mall
Suite 1400
Boston, MA 02108
(617) 723-9165

**CERTIFICATE OF SERVICE**

DECOF & DECOF
One Smith Hill
Providence, RI 02903
Attn: John S. Foley

I hereby certify that I electronically filed **Defendants' Pretrial Memoranda** on March 26, 2008. This document is available for viewing and downloading from the Court's Electronic Case Filing System. Service on the above counsel has been effectuated by electronic means.

"/s/Robert E. Collins"
Robert E. Collins