Volume I
Pages 1-172

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

Civil Action
NO. 05-450-S

LYNN M. SUTHERLAND, :
Plaintiff, :
:
vs. :
:
HYC, INC. and JEFFREY BARROWS, :
Defendants. :

DEPOSITION of LYNN MATTHEWS-SUTHERLAND, a witness in the above-entitled cause, taken on behalf of the Defendants, before Barbara M. Montijo, RPR, Commissioner in and for the State of Rhode Island, at the Law Offices of Michael R. Hagopian, 212 Greenwich Avenue, Warwick, Rhode Island, on July 11, 2006, scheduled at 10:00 a.m.

DUNN & GOUDREAU
COURT REPORTING SERVICE, INC.
One State Street
Boston, MA 02109
(617) 742-6900

interior design department and we had designers that worked there. I oversaw that department and just made sure that things would go according to schedule, deliveries were made and clients were happy, but primarily, my position was to -- were the operations of the galley on a daily basis.

Q. How old were you at the time?

A. I was very young. I was 24. 23, 24. I was very young and I was very lucky.

Q. How long did you work with that company?

A. I stayed there until 1981.

Q. So, approximately four years?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. What did you do for employment at 1981?

A. And then in 1981, my mother had had an interior design firm and she was becoming very busy. And at the time I was -- I thought I was going to stay at the galley and just help her on this one project, but the project was a very large project. And when I started to get into it, it was for a big developer in New York, I left the

eight buildings for them in New York.

Q. How many for the Parker Organization?

A. For the Parker Organization, we did a very large condominium development in New Jersey for them. We also did model apartments for Donald Trump at Trump Park, which is located on Central Park South. We also did model apartments for the Albanese Organization at 100 United Nations Plaza. We also do model apartments at the Museum Tower on East 53rd Street. In addition to doing model apartments, what also happened is clients would come in to see the model apartments, maybe not buy in that building, but would hire us to do apartments in another building.

Q. So, you also received separate engagements by clients who saw what you designed for the various corporations?

A. Yes.

Q. How long did you stay with Mary Matthews?

A. Twenty-two years.

Q. When did you conclude your relationship with Mary Matthews?

A. 2003.

Q. What was the reason for concluding your relationship?
A. My mother was getting older and we had a different vision of the business and I decided to leave.
Q. Go out on your own?
A. Well, I didn't go out on my own, I -- well, what I did is I set up my own business, my own corporation, but I went into partnership with an architectural firm as their head designer, their lead designer. I was in charge of their interior design projects, which was based in Glen Cove.
Q. With regard to Mary Matthews, when did you leave in 2003?
A. August.
Q. Is that business continuing?
A. Yes.
Q. Is your mother still running the business herself?
A. Yes.
Q. Has she hired somebody to replace your work or you?
A. No.

a roundabout figure?
Q. Sure.
A. About 125,000, 130,000. Not including my car.
Q. What type of car did you have?
A. Mercedes.
Q. Which one?
A. The wagon.
Q. When you left Mary Matthews in 2003, was it on an amicable basis?
A. No.
Q. Was there any litigation as a result of leaving?
A. Yes.
Q. Did your mother bring suit against you?
A. Yes.
Q. Where was the suit filed?
A. I guess in New York, but I'm not sure -- I guess it was Long Island because the office is located in Garden City.
Q. Have you ever been to a courthouse --
A. No.
Q. -- with regard to that litigation?
A. Ut-ut. No.
Q. Is that litigation still pending?
A. No.

Q. Is it settled?
A. Yes.
Q. What were the terms of the settlement?
A. Well, basically they sent me notice after I left, demanding I surrender my car because the car belonged to -- we always referred to the company as MMI, MMI, Inc. and the car belonged to MMI, Inc. Since I was leasing it through MMI, Inc., they gave me ten days to return the car, which I did. I took it to the dealership. I returned the car and I bought a new one.
Q. And that's what the suit was about?
A. Basically. It was really nothing about money, except that, you know, she just stated in her suit that I was not to use her name or benefit -- it was quite silly, actually. Or try to benefit off of her name in any way.
Q. So, no money changed hands?
A. No. No money changed hands.
Q. Did you sign any type of release?
A. Uh-huh.
Q. Yes?
A. Yes, I did.
Q. And to your knowledge, the suit is completely

Q. When did you start your company in interior design?
A. August 2003.
Q. Did you start it at any time before you left in August of 2003?
A. No.
Q. You told me that you were in partnership with an architectural firm in Glen Cove, what's the name of that company?
A. I was. Smirose & Smirose.
Q. Are they any relation to you?
A. No.
Q. Did you work with Smirose & Smirose when you were with Mary Matthews?
A. No.
Q. What was your relationship with that firm after you created your own firm?
A. I met Smirose & Smirose originally because they had two extremely large projects that had come into their office, one was a 20,000 square foot home and another was a 10,000 square foot home. The person that he had on staff, these two particular, very sophisticated clients did not want to work with her. I met them and we

and you'll have an opportunity to correct it.
Q. Do you want to change that?
A. I believe I started at Smirose in February. I met with them in February of 2000 -- it had to be 2002. Let me see. 2002 and then 2003 -- maybe it was 2003 and then I had my accident. I must have been with them a year and a half when I had my accident. I'm sorry, I'm very vague on these dates.
Q. That's all right. If we can work together, we'll work together on it.
A. Okay.
Q. You became affiliated with Smirose in February of 2003?
A. Uh-huh.
Q. Is that correct?
A. Yes.
Q. Now, there were three sets of dates that you were going to give me for the completion of these homes. The owners, the architect's, and yours.
A. Well, I think the owners wanted to both move in within a year.
Q. So, February 2004ish?

A. Uh-huh.
Q. What was the architect's view of move-in date?
A. I think his view was the same as mine, that certainly the 20,000 square foot home would take two years to complete.
Q. So, 2005? The early part of 2005?
A. Uh-huh.
Q. You have to say yes.
A. Yes.
Q. How about the 10,000 square foot home?
A. The same time.
Q. So, you're looking at about a year later than the owners; is that correct?
A. Uh-huh. Yes.
Q. You started working on those two homes in February 2004 -- excuse me, 2003?
A. Yes.
Q. Sorry. When you first became connected with Smirose & Smirose, which was February 2003, that's when you started working on these two 10,000 and 20,000 foot homes?
A. I immediately started shopping and working with both clients.
Q. From February 2003 to the end of 2003,

December 31, 2003, did you have any other projects other than these two homes?
A. No.
Q. Were you looking for any other projects?
A. Absolutely not.
Q. So, these two homes took up your full time?
A. Completely.
Q. In your business, which is Matthews-Sutherland Design Associates Limited, other than yourself, were there any other employees?
A. No.
Q. Did you work out of your own home?
THE WITNESS: When I was on my own?
MR. MUZYKA: Yes.
A. Yes, but at Smirose I had an office.
Q. So, you could use an office there?
A. Oh, I had an office and three assistants.
Q. In the year 2004, the year of the injury, did you have any other projects other than these two homes?
A. No, but I was actually looking into -- I had met with the owners of Brooks Brothers to work on their home, the Delvecchios and I had also met with another client of Smirose. He had just

Q. What was your compensation agreement with Smirose & Smirose?

A. I was a partner. 50 percent partner. So that all commissions paid we split.

Q. Now, was that all commissions for all type of work or for interior design?

A. Interior design and architectural work that related to the interior design of the project.

Q. Now, what is typical architectural work that relates to interior design?

A. For instance, if I shopped with a client and I selected bathroom fixtures, bathroom tiles, kitchen cabinets, anything that affected the architecture of the home, then I was entitled to a 15 percent commission; whereas, opposed to the interior design, we charged 30 percent.

Q. Help me. You say that the company you were involved with, Smirose & Smirose, charged 30 percent commission for interior design?

A. Uh-huh. Yes.

Q. And charged an additional 15 percent commission for architectural changes?

A. No. Their architectural fee, they design the house, was 15 percent of the cost. So, if the

client's home was $12,000,000, they got 15 percent. I -- my compensation was not based on that 15 percent; that was strictly architectural fees; however, if I took them to a showroom and selected a kitchen for $200,000, then I was -- then the fee would be 15 percent of the 200,000.

Q. And if you did interior design work, wallpaper, furniture, things of that nature, you would get 30 percent of the cost of whatever those items was?

A. Total sales, yes.

Q. Now, help me. That would be what Smirose & Smirose would charge the homeowner?

A. Right.

Q. So, whatever Smirose & Smirose got, you would get 50 percent of that?

A. Exactly.

Q. So, you'd get 7-and-a-half percent on architectural and 15 percent on interior?

A. Yes.

Q. In the first year that you worked at Smirose & Smirose, from February of 2003 to the end of that year, what did you earn?

A. It would be -- it's very hard for me to say

without having my spreadsheets in front of me, but I could tell you what I got on a monthly basis.

Q. Okay.

A. Does that help you?

Q. Sure.

A. We had an arrangement, just so that I had a cash flow, that I received compensation $8,000 a month.

Q. That started in February of 2003 and continued until you ended your relationship with them; is that correct?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. So, would that be an advance?

A. Yes.

Q. Did you ever receive any other monies over and above the $8,000 a month advance that would settle up between you and Smirose & Smirose on commissions, say, at the end of the year, the end of the project, the end of the quarter, whatever?

A. I never received the money owed to me from

Smirose & Smirose due to my accident.

Q. Do you have a lawsuit against them?

A. Not yet.

Q. Do you intend to?

A. I have not decided.

Q. How much do you claim they owe you for commissions approximately?

A. This is a very offhand figure, but approximately $100,000. It could be more. May I just say something?

Q. Sure.

A. Because what happened was, when I was injured, I could not continue to work. I tried to help out. I took phone calls and my assistant came, but it was just overwhelming. These clients were very, very demanding, but I -- the way it worked at Smirose was that anything that I speced, anything that I designed or I speced, I was entitled to 50 percent of that. So, therefore, when I was injured, I had already speced many items and my commission -- I had gotten half of it, the balance would be paid once the project was completed or installed, that was about to happen. And since I did not