COMPREHENSIVE REHABILITATION CONSULTANTS, INC.

January 22, 2007

Diagnostic & Evaluation Services

Assessment of Home & Work Modifications & Accommodations

Continuum of Care Planning

Vocational Evaluations & Job Placement Assistance

Special Needs Research

Case Management/ Advocacy

Guardianship Planning & Support

Rehabilitation & Habilitation Counseling

Disability Management

Habilitation & Rehabilitation Administration

Into the Future Planning www.into-the-future.com

John Foley, Esq.
Decof & Decof
One Smith Hill
Providence, RI 02903

RE: Lynn Sutherland

Dear Mr. Foley:

Lynn Sutherland, a 52-year-old woman, was evaluated on November 13th, November 30, 2006 and January 4, 2007. The battery included an interview, Ruff Neurobehavioral Inventory, RIST, Pain Patient Profile, Personality Assessment Inventory and Quality of Life Inventory. She was referred to assess her current status with particular emphasis of the effect of her condition upon her vocational potential, future rehabilitation needs and quality of life. The evaluation encompassed approximately 8–9 hours of interviewing and testing. Records from the following were also reviewed:

Robert Hotchkiss, MD

Dr. Lana Kang

David Green, MD

Edward Nalebuff, MD

☐ *Miami:* 11428 S.W. 109 Road • Miami, Florida 33176-3148 • Tel.: (305) 595-8232 • Fax: (305) 598-1073 • e-mail: crcmiami@netrox.net
☒ *New York:* 275 Madison Avenue • Suite 2400 • New York, New York 10016-1101 • Tel.: (212) 370-5544 • Fax: (212) 986-2757
☐ *Buffalo:* 66 Dana Road • Buffalo, New York 14216 • Tel.: (716) 877-5833 • Fax: (716) 877-5834 • e-mail: crcbuffalo@verizon.net

Medical Summary

Robert Hotchkiss, M.D. on December 7, 2004 noted that Ms. Sutherland was a new patient seen with a chief complaint of crush injury to her right dominant hand which occurred on 8/21/04. She was treated acutely by Dr. Griggs with an IND right index finger open fracture with internal fixation of the proximal phalanx repair. She underwent numerous surgical procedures. She came for a second opinion on the status of her condition as well as treatment recommendations. She was not satisfied with the care she had received. She also had been seen by Dr. Lane who performed a manipulation under anesthesia surgery which did not provide relief. She was going to hand therapy diligently and reported minimal progress, but was very disciplined in her regimen. She felt she received some relief. She was an interior designer. After examination and review of radiographs, Dr. Hotchkiss noted, in a report dictated by Lana Kang, M.D. that she presented with a very difficult problem given the complex mechanical flexion extension system of the digits and the scarring that had occurred secondary to the injury. However, improvement could be made although the degree of progress could not easily predict. Therapy was recommended with ongoing pain medication. Her lack of sleep appeared related to her process of grief that was associated with a traumatic injury of this nature and that with time she would be able to accept it and cope with it.

On February 3, 2005 the report dictated by Dr. Kang indicated that Ms. Sutherland was seen for follow-up visits for a crush injury to her dominant hand that led to a traumatic amputation of her ring finger. She had been in therapy for edema control and showed marked improvement in her attitude. She had had improvement in her edema and erythema. However, the general posture of the hand was unchanged. She had full

extension of her PIP and DIP joints in her index finger and middle finger and slight increased mobility of her small finger. Her metacarpal joints, however, were slightly flexed. There was significant scarring noted as well. The impression was post-traumatic tendon adhesions and contractions of her middle finger as well as small finger and traumatic amputation of her ring finger. A staged operative procedure was recommended. The procedure would require optimal pain control during her hospital stay as well as aggressive therapy post-operatively. There was a possibility her condition would not be improved.

Subsequently, on 3/7/05 Dr. Hotchkiss with his assistant Dr. Kang undertook the initial operative procedure, a right index finger and middle finger proximal interphalangal joint contract are releases, among other procedures. She was discharged on 3/11/05 with the principal diagnosis of joint contracture of the hand and secondary diagnosis of unspecified constipation; ankylosis of the hand; arthropathy of the hand; depressive disorder; late affects of crushing arm fracture; trauma amputation; transport accident. The principal procedure was hand joint structure division; secondary procedure was internal fixation device, lysis of hand adhesions, manual rupture of joint adhesions. She was a 51 year old female with a crushing injury to the right hand in August 2004, status post open reduction and internal fixation coupled with reconstructive surgery. She presented for further surgery of the right hand. She had limited range of motion and occasional pain. She also complained of constant parasthesias of the finger mainly in the first and fourth fingers. Past medical history was significant for depressive disorder, pharyngeal cyst, status post infection and history of pneumatic fever. She was discharged home on Vicodin, Colace and prescription for physical therapy.

By March 22, 2005 Dr. Hotchkiss noted improvement. This persisted as of May 5, 2005. By May 26, 2005 she reported continued improvement with therapy. She was asking about a prosthesis for the right ring finger.

On April 27, 2006 Dr. Hotchkiss wroted that Ms. Sutherland was a patient with a crush injury to the right hand. She was right hand dominant. She was still experiencing pain and stiffness in her right hand, index and middle fingers. She had an amputated ring finger. She wore a glove on the right hand due to be both mental and physical stress. Additional surgeries were still being discussed. As an interior designer, Ms. Sutherland used her hands extensively, showing fabrics and sketching as well as shopping with clients. It was difficult to determine when, if ever, she would be able to return to work in full capacity as an interior designer or perform her duties as she did prior to her accident.

On May 17, 2006 David Green, M.D. evaluated Ms. Sutherland, referred by Dr. Hotchkiss. When seen, she appeared to still have more or less constant low grade pain which increased when she used the hand. She had rather severe cold weather intolerance and wore a glove full time. After examination, Dr. Green's impression was severe problems with her fingers. He was unsure if a prosthesis was an appropriate step. He felt the next step would be additional surgical interventions. He felt that it would be impossible to wear the finger prosthesis given the finger sensitivity she experienced.

On June 28, 2006 Edward Nalebuff, M.D. examined Ms. Sutherland. He noted that at the present time the patient was still quite handicapped with the right hand. She wore a glove on the hand and she was quite concerned about its appearance. She complained of pain and tenderness over the amputation stump of the right finger. She was having increasing pain at the base of her left thumb which was obvious degenerative

arthritis. She felt that these symptoms had become quite severe, related to the fact that she could only use her left hand for light activities. His examination confirmed moderate arthritis. She was starting to develop deformity of the thumb. There was an obvious partial amputation of the ring finger. as well as altered sensation, scarring and contractures. She had thus sustained a very significant injury to her right hand which had left her with essentially stiff interphalangeal joints of the index and mid-fingers and amputation of the major portion of the ring digit. She had limited motion of the small finger. Her thumb though was entirely normal. She had approximately a 45 % loss of hand function. She had not reached an end result but it would take an extensive and complicated surgery to improve her overall function. A ray resection of the stump of the ring finger would certainly help the cosmetic appearance of the hand. In regard to the left hand, she may well come to an arthroplasty at the basal joint because of the pain as she would need to use this left hand for most activities.

Background and Current Situation

Ms. Sutherland was born in Queens, but raised on Long Island. One of five children, she comes from an intact family supported by her father, in the "insurance business" and her mother, an interior designer. Her early childhood is unremarkable. Family history is noncontributory. Ms. Sutherland has been married to John, a 52-year-old financial advisor for UBS, for 20 years. They have two children, a son, aged 18 currently attending Cornell University, and a daughter, aged 15, a 10th grade high school student. The family resides in Manhasset, a town in Nassau County.

Ms. Sutherland recently underwent surgery with Dr. Hotchkiss at the Hospital for Special Surgery i.e., tendon release to try to increase mobility in her right hand. This has been followed with intense physical therapy and a home exercise regimen. Unfortunately, despite these efforts her fingers are again "tightening up". [Consequently, recently in the office Dr. Hotchkiss, numbed her fingers, and attempted to manipulate the fingers manually.] She not only attends physical therapy daily at the hospital, but utilizes a range of motion machine at home. She is uncertain what will follow if these procedures are not effective. Probably she will then consider implants which will supposedly increase her mobility by replacing her joints. Unfortunately, she is already experiencing arthritis in her left thumb from an overuse syndrome.

Ms. Sutherland tries to limit her prescription drug intake given her experience of inhibiting and sedating side effects in the past. She now only tries to take two Vicodins a day. She only utilizes Ambien about three times per week to aid sleep. She sleeps with a nighttime splint to keep her fingers straight, a device that is very uncomfortable and that impedes rest as well. She is not now in psychiatric care. However, soon after the accident she was in treatment and was medicated with Cymbalta for depression. She still characterizes herself as "obviously not okay". Initially she acknowledges she "spent months in bed and going to the doctors or therapy ". At this juncture, although there had been an improvement, rehabilitation remains "all consuming". As far as she is concerned, at least for the foreseeable future "this is a full-time job".

Ms. Sutherland graduated high school in Franklin Square, a good student who then attended an all girl's school in New Jersey for one year before transferring to the

New York School of Interior Design, where she completed a three-year program at age 23. She has no additional formal education or training.

After college, she began as an Administrative Assistant and then quickly, through recommendations, was hired by Deirdre Aaron, Inc., a "foremost 18th-century French antique room" to run their New York office. She continued in this position for approximately 5 years and then went to work with her mother in 1983 at Mary Matthews Interiors, Inc. She was employed as an interior designer within this firm. The firm dealt with "high end clientele". She remained until August 2002, at which point she opted to go out on her own, initiated Matthews Sutherland Design Associates Ltd. At the time of her accident she was involved in two very large projects i.e., decorating multimillion dollar mansions. The accident occurred in August, 2004. She made an attempt after her accident to return to meetings, continue with client contacts, etc. However, she found it impossible to persevere. She was not feeling well; she was on heavy analgesics; she was in pain. She was not able to develop the persona or the intellectual agility necessary to do her job. She subsequently left the field completely in the fall of 2004.

Unfortunately, even at this juncture Ms. Sutherland believes she lacks the drive to continue in this business. She must present herself in a certain way ("I'm not up for it"). She had very demanding clients that called her morning and night with meetings, travel, etc. At this juncture she is "beaten, worn down by this whole thing. When you have constant pain, it just wears you down". Sleep is disrupted; fatigue is enhanced. She acknowledges that she's depressed and feels "worn out and tired". In contrast, prior to the accident she had an abundance of energy. She was "on the go", chairing meetings, giving speeches, organizing events, going to lunches and dinners, socializing, etc. Now, she is

isolated and self-conscious about her hand ("I didn't even look at my hand for eight months after the accident. I don't want to get into it.... I don't want to talk about it.") Nevertheless, she ruminates about the accident. She acknowledges that she will "never get on another sailboat... I can't look at it, not even pictures of a sailboat". She wakes up at night, reliving the accident. She is emotionally labile, bursting into tears when anything reminds her of her condition. Fortunately she denies significant cognitive deterioration and characterizes her family as very supportive ("They know how I was").

Given this attitude, it is not surprising that Ms. Sutherland believes she is still not capable of returning to work. [She just underwent surgery and now is involved with intense physical therapy, so even if she had the mental attitude necessary to return to her past position, her physical rehabilitation would currently preclude this outcome.] To return to her past profession, she would have to be ready to "dress and look the part". She is still very self-conscious about her hand. ("The hand is always, always covered. I don't walk around the house even without it covered. I don't want to look at it. It's ugly and deformed.") In the past she had an office, an assistant and a bookkeeper. She has now been out of the field for two years. She estimates $300,000 to $400,000 of "seed" money would be needed to reestablish a new business i.e., "to set up an impressive shop" to lure in new clients, and to hire an assistant and bookkeeper. She acknowledges that it would be essential that she have an assistant to do the physical aspects of the job that she no longer can negotiate. She also realizes that she would need a "cushion" to sustain herself while she attempted to develop a new client base. However, even if she had the wherewithal to start such an endeavor, (which she does not) it is unclear whether at this

point it would be successful. She doesn't feel she could seek work in other fields. She doesn't believe she could return to school as well.

Ms. Sutherland's premorbid history is unremarkable. When injured, she was employed as an interior designer, married and residing with her family. Her spare time was spent with her family, traveling and "just being a mother". She anticipated she would continue within the interior design field.

Current Complaints

At this juncture Ms. Sutherland is a little over two years post injury. She is right-hand dominant. She sustained amputation of her ring finger between the knuckle and the first joint. Her index and middle finger are nonfunctional and won't bend (this was the focus of the current surgery). Her pinky remains "a little crooked". Her thumb is unimpaired. She is in constant pain and characterizes her pain on a normal day with medication as of moderate severity. Cold and humid weather increase pain ("I don't go out on a cold day.") Pain is always there ("Feels like knives attacking my fingers"). When her hand is touched or hit, pain increases. She is very protective of the limb. As noted, sleep is disrupted. Her grasp is diminished. She lacks sensation. There is a loss in strength. Fine finger dexterity is negatively impacted. [For example, she has difficulty buttoning.] Left thumb pain has increased from an overuse syndrome. ["By the time I am 60, I will be a shriveled up old lady".]

As noted, she denies cognitive change, but as stressed acknowledges ongoing psychological ramifications to the point that "I can't even talk about it. I can't handle it. It's taken an emotional toll." She though is hesitant to initiate formal psychiatric

treatment. She laments that talking about the condition is uncomfortable; it doesn't change the situation. She is concerned about medication side effects. She hopes that "the only way to get through this is with time". [However by the last session she was more open to counseling, adding that her therapist had suggested treatment given her emotional outbursts during physical therapy sessions.]

When questioned about her future, Ms. Sutherland could only state "I just don't have one… I have no plans."

Current Assessment

Ms. Sutherland arrived a few minutes late for her first session. A stylishly dressed and groomed woman, Ms. Sutherland's right-hand was in a cast/bandage. She was an articulate, clear historian. However, as soon as the topic of her impaired hand was broached, she immediately burst into tears. She though was able to regain her composure, but periodically became tearful throughout the interview. There, though, were no signs of marked psychiatric disorder other than that relating to repercussions from her impaired limb. Her presentation remained unchanged through the latter two meetings. Again, an emotional lability (with rapid tearfulness and crying) was still prominent.

In order to generate an understanding of Ms. Sutherland's adjustment, a cognitive screening was undertaken. Her performance on this assignment reveals cognitive functioning within the average range. However, even within basic screening, psychological issues were evident. For instance, she became upset even at times on the verge of tears; she made constant derogatory remarks about her performance. At

moments she appeared to blank out missing simple items and then passing more difficult ones; a few moments later she was spontaneously at times able to correct her previously wrong response. In this way even in a supportive milieu her cognitive abilities were at least somewhat compromised by psychological factors, although not to a severe degree. Unfortunately this pattern strongly implicates that when pressured or stressed greater cognitive compromise could be expected.

The extent of her adjustment problems were also investigated in objective personality inventories. On the first inventory Ms. Sutherland rated her life both before and after her accident. She was able to produce a valid profile in both scenarios, although she has a significantly enhanced positive view of her premorbid adjustment than of her current life. Concerning her present adjustment she does not report significant cognitive change except in the realms of attention and concentration, rating her ability to focus as significantly less competent than that as noted premorbidly. The emotional realm reveals particular ramifications in depression and post-traumatic stress symptomatology. A marked deterioration in the physical realm is also noted. Although she does not report unusual significant changes in neurologic symptomatology, pain and basic health concerns are significantly and absolutely elevated, especially within the pain domain. She also experiences a marked deterioration in her capacity to negotiate basic activities of daily life and a significant deterioration in the social and especially the vocational realms.

On a second inventory Ms. Sutherland rated her adjustment as contrasted to a community sample and chronic pain patients. Anxiety levels are not elevated, commensurate with the previous investigation, but depression is significantly elevated, on par with chronic pain patients and significantly above the general population. Health

concerns are by and large somewhat below chronic pain patients but noticeably elevated when compared to the community sample.

Ms. Sutherland also completed an extended personality inventory in which she rendered an opinion of her current adjustment. On this assignment, she tried to present an overly "optimistic" view of her situation. She displayed a reluctance to acknowledge even common human shortcomings and frailties that most people admit. Consequently, the test results are unlikely to be a valid representation of her current level of adjustment. Despite this level of defensiveness, she still reports significant problems in connection with traumatic events, physical signs of depression, unusual sensory/motor problems, unhappiness, poor anger control, physical complaints, feelings of helplessness, stress, moodiness and preoccupation with physical functioning.

On a final inventory Ms. Sutherland rated her quality of life as contrasted to a community sample. Fortunately there are still many areas of support that serve as a means to enhance her overall quality of life, particularly her family and home environment. Nevertheless, health and work have been particularly negatively impacted.

Vocational Implications

If Ms. Sutherland had not been injured, the most probable course would have been continuing in the interior design field with the "high end" clients she had worked with for many years, moving up that career ladder. She was a successful interior designer, who according to Ms. Sutherland was capable of earning well into the six figures given the type of clientele she worked with. It should be stressed that this was a very demanding enterprise. It required her to be essentially "on call" throughout the day. Not

surprisingly her clients expected extremely personalized service. It was necessary for her to maintain a pleasant disposition, an alertness and a cognitive agility, i.e., appearance, competence, and personality to negotiate successfully the demands of her profession.

At this juncture Ms. Sutherland has just recently completed surgery and is still involved with intensive rehabilitation. Obviously, in any scenario for the foreseeable future, she will not able to work. Unfortunately, there are multiple negative variables in returning Ms. Sutherland to her previous vocation. She has already been out of that marketplace for the past two years. To return she would need to reestablish herself after an extended hiatus. She herself, rightly notes that funds would be necessary to establish an office, hire personnel, etc. while she attempted to develop a new client base, a scenario which even if she was able to undertake, may never turn out to be successful. This scenario of course assumes that Ms. Sutherland has developed not only the physical capacity to return to her past profession, but the psychiatric stability to do so as well. Without doubt, this woman displays significant psychiatric sequelae. Her comments as well as her presentation strongly implicate elements of both a post-traumatic stress disorder and significant depressive symptomatology. The overall focus, thus, is of a woman who has not been able to mobilize her resources to return to a position that requires her to be exceedingly "on" to succeed within this venue. [She even has difficulty mobilizing herself effectively in less demanding work, let alone to initiate and run a very highly demanding operation.] She is also an "elderly" worker, an additional negative repercussion. Given this complicity of variables i.e., out of the business for two years, not having the wherewithal to apply herself effectively to initiate a new venture, problems initiating new contacts, loss of client base, a recent surgery, ongoing psychiatric

ramifications, continued physical limitations, etc. the overall prognosis is that Ms. Sutherland is unlikely to ever return to her past lucrative enterprise.

It is also uncertain whether she has the ability to return to work given the prominence of her psychiatric condition. At this point, unless her psychiatric status improves, her ability to "translate" her retained capacities effectively remains latent. Unfortunately, as her condition increases in chronicity, the vocational prognosis also becomes increasingly grim.

Conclusion

If Ms. Sutherland had not been injured, the most probable vocational course would have been continuing in the interior design field. At this juncture multiple negative vectors makes it improbable that she could return to work in this highly demanding venue. Unfortunately, there is concern about her ability to function effectively in any work setting. Certainly, her emotional lability is a particularly negative factor. She cries readily with even minor provocation highlighting a psychological fragility and lack of emotional control. Consequently, even if somehow her physical limitations could be circumvented (which of course would be problematic given a significant upper extremity deficit fostering marked deficits in basic motor control, manipulation, and execution), psychiatric factors are still of great concern. As stressed it is over two years since her injury. Her situation is already chronic in nature. Unless there is a significant improvement in her pain status, psychiatric status, and physical functionality, any viable return to the world of work is unlikely. Certainly, if pain decreases, her psychiatric status improves, and compensatory techniques are developed in connection with her dominant

hand, some modest vocational accessibility would then emerge. However, it should be stressed that even in the "best" (and of course yet unrealized) scenario, her capacity to negotiate highly demanding and stressful work would be extremely unlikely. If she does compensate to an expected degree, such jobs as in retail sales, telemarketer, receptionist, information clerk, etc., would be within her repertoire, i.e., work that minimizes upper dexterity motor skills, and relies on language abilities. Extensive training time would not be feasible, reflecting her age as well as her psychiatric status. Unfortunately, these jobs are of a modest paying nature. For example, viewing U.S. Government Department of Labor, Bureau of Labor Statistics from May, 2005 in New York State reveals such positions as paying between $22,670.00/per annum (retail sales) to a high of $26,150 (telemarketer). In this respect, where previously a six figure income was historically within her repertoire, at this point the most probable outcome is that Ms. Sutherland will not return to the work force. If she does eventually recomppensate to a certain degree that work is feasible, wages (given the combination of her age, physical limitation and psychiatric status) will be modest in nature (i.e., essentially centering around $25,000.00/per annum) when able to fine employment. Unfortunately, even in this more "optimistic" outcome loss of workforce participation would be probable, reducing her earning potential accordingly.

Enclosed are the summary test scores.

Very truly yours,

Richard Schuster, Ph.D.
Vice President
Comprehensive Rehabilitation Consultants Inc.

Summary Scores

RUFF Neurobehavioral Inventory

Premorbid

| Scale | T-Score |
|---|---|
| NG | 42 |
| PZ | 59 |
| C | 44 |
| E | 42 |
| P =or less than 40 | |
| Q =or less than 40 | |

Post morbid

| Scale | T-Score |
|---|---|
| NG | 45 |
| PZ | 39 |
| C | 51 |
| E | 55 |
| P | 69 |
| Q | 65 |
| IN | 45 |
| IF | 56 |

Quality of Life Inventory: T = 55 67th percentile

Patient Pain Profile

| Scale | T-Score |
|---|---|
| DEP | 54 |
| ANX | 36 |
| SOM | 44 |

Personality Assessment Inventory

| Scale | T-Score |
|---|---|
| ICN | 55 |
| INF | 47 |
| NIM | 44 |
| PIM | 68 |
| SOM | 59 |
| ANX | 45 |

| | |
|---|---|
| ARD | 60 |
| DEP | 73 |
| MAN | 34 |
| PAR | 38 |
| SCZ | 38 |
| BOR | 45 |
| ANT | 40 |
| ALC | 47 |
| DRG | 42 |
| AGG | 44 |
| SUI | 45 |
| SDR | 50 |
| NON | 39 |
| RXR | 57 |
| DOM | 60 |
| WRM | 62 |

Reynolds Intellectual Screening Test

Index=98

| Scale | T-Score |
|---|---|
| GWH | 50 |
| OIO | 47 |