UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

----------------------------x

LYNN M. SUTHERLAND,

Plaintiff,

v. 05-450-S

HYC, INC. and JEFFREY BARROWS,

Defendants.

----------------------------x

January 28, 2008
1:45 p.m.

Deposition of RICHARD SCHUSTER, taken by defendants, at the offices of Richard Schuster, 275 Madison Avenue, Suite 2400, New York, NY 10016, before Jessica L. Loschky, Shorthand Reporter and Notary Public.



APPEARANCES:

DECOF & DECOF
Attorney for plaintiff
One Smith Hill
Providence, RI 02903
BY: JOHN S. FOLEY

CLINTON & MUZYKA, PC
Attorney for defendants
One Washington Mall, suite 1400
Boston, MA 02108
BY: ROBERT E. COLLINS



STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED, by and between counsel for the respective parties hereto, that all objections, except as to form, are reserved to the time of trial.

IT IS FURTHER STIPULATED AND AGREED that the deposition may be signed and sworn to before any officer authorized to administer an oath.

IT IS FURTHER STIPULATED AND AGREED that the sealing and filing of the deposition be waived.



Schuster

RICHARD SCHUSTER,
called as a witness, having been duly sworn, testified as follows:

EXAMINATION

BY MR. COLLINS:

Q. Could you state your name, sir?

A. Richard Schuster, S-C-H-U-S-T-E-R.

Q. Mr. Schuster, my name is --

A. Dr. Schuster.

Q. Dr. Schuster, my name is Robert Collins, and I represent the owners of the sailing vessel, Heritage. I notice from your CV and appearance record you've been deposed a number of times.

A. True.

Q. Just briefly, if you could let me finish the question before you start answering. Obviously, if you want to take a break, just ask and we'll certainly accommodate. If you have any questions that you want to confer with Mr. Foley about the response, that's fine. I would ask if there's a question pending, there be an answer, and then you can always correct it if need be.

Could you give me your address?

Schuster

pretty sure they did. I don't know the specific details.

Q. Do you know if she had assistance when she was working on her own after her mother?

A. Only what Ms. Veatch wrote in her report that there was assistance available at the Shmiroth(ph) Firm. That's the only thing that I know about.

Q. Did you give her any vocational testing?

A. I gave her an IQ test and did the personality test.

Q. Those are psychological tests?

A. Well, they are -- again, whenever I do vocational evaluations, I give those tests as well. I didn't give her like a clerical aptitude test or anything like that primarily because it was an issue that didn't appear to be, at this point, fruitful to investigate or appropriate, and I wasn't going to put her through hours of testing for no real reason.

Q. Okay. Do you know if she ever had psychological treatment before the accident?

A. She denied it.



Schuster

Q. What are your opinions as to Mrs. Sutherland?

MR. FOLEY: Object to the form.

You can answer.

A. Okay. Well, that's -- okay. This is a woman who has sustained a significant dominant hand injury that has, of course, affected manipulative skills and physical capacities. It's also left her with a chronic pain syndrome, but it has produced, on top of this, a reactive PTSD and depressive symptomatology that, at this point, had become chronic in nature. And that, in essence, posed a second disability upon an initial physical disability. With the two of them interacting synergistically, meaning each -- together they are more prominent than each would be alone in undermining her capacity to return to the work force.

If there is some improvement, I think she could do some type of basic competitive positions, as I outlined in the report. I think it would be improbable to expect her to reach a level of psychological integrity that she be able to deal with any type of high-pressured, working



Schuster

with people, being "on," -- with quotation mark: -- in terms of her presentation, functioning at the same level of cognitive efficacy that one would expect that she did premorbidly. So that even in the best probable scenario, she's going to get somewhat better, let's presume she wen' treatment and medications and whatever, will r reach premorbid levels and, in my experience a opinion, it's likely to wax and wane, symptomatology as well.

As stresses in her life ensue, she is likely -- more likely to deteriorate and get somewhat better, and this is what you would likely see throughout her life. So an underlying psychological fragility would persist. That's what I think is the probable scenario for her.

Q. So she has chronic pain syndrome?

A. Yes. She has pain in her hands all th time.

Q. And also on top of that is the chronic PTSD?

A. And problems with the fingers, of course, too. She has physical problems with h hand, but then on top of it, it's PTSD and



Schuster

depression related to her medical condition. S that you have this -- I'm saying like a double whammy.

Q. What would be a treatment for chroi pain?

A. You know, it depends on what the chronic pain is going to be.

Q. Well, for her?

A. Again, I would -- if it turns out that appropriate medications are not affective, the doctors -- you know, I mean, I would send he a pain management specialist. You got to loc it. You have a whole combination of issues h It's not only the type of pain she has, but whi kind of side effects does it have on her, it is overly sedating, how does it affect her functioning, the side effects, et cetera, et cetera, et cetera. You have to go back to the doctor to make those determinations.

Q. Do you know if she's been to any p management?

A. When I saw her, no, she was just getting management of her conditions by hei surgeon.

45

Schuster

Q. Dr. Hotchkiss?
A. Yes.
Q. Now, is it your diagnosis that she has PTSD, or has anyone else diagnosed that?
A. I haven't seen any other reports from anybody else to answer that question. I can only tell you that that would be my -- if you are going to ask me for a diagnosis, are you asking me for a diagnosis?
Q. I think I did.
A. Then I would diagnosis her with PTSD and depressive syndrome, whatever you want -- related to a medical condition. That would be my diagnoses for her.
Q. What would be the treatment for PTSD?
A. I think I've already said this. Same thing.
Q. Psychotherapist, or psychiatrist?
A. Medication, you look at it and see how it goes, right.
Q. How about for depressive syndrome?
A. Same thing.
Q. To your knowledge, she hasn't sought either?

46

Schuster

A. She just -- initially.
Q. A couple of times?
A. Yes, as far as I know.
Q. In your experience, how long does PTSD last, if treated?
A. The longer it goes on, the worse it is. So it's already chronic. So with her, as I said, this would be not a -- two, three years go by and the symptomatology persists, not a good prognosis.
Q. So it would be a better prognosis if she kept treating with the psychiatrist?
A. Maybe. That's the best I could say here, and sometimes people go for the treatment and it doesn't particularly work, the medications. Other people get better. So the best you could say is that she -- you know, she may have responded to treatment somewhat or whatever. We'll never know, but there is no guarantee.
Q. A couple more questions about your report. On the last page you refer to Bureau of Labor Statistics. What were the parameters of that? College graduate?

47

Schuster

A. No. I just looked up the different jobs that I felt that she could be doing. You know, retail sales, telemarketing, receptionist, basic administrative type of work. Maybe could work around her dominant hand injury. Something that's not going to be particularly stressful.
Q. Did you look to see if there are any jobs available?
A. I'm saying, if she was able psychologically to get herself together to do it here, I think that would be the types of jobs I think she could reasonably do and pay in the 20s, not looking for a high-power job.
Again, I'm going to say the same thing, I think if you put her in that type of position, I think you are going to see an exacerbation of the PTSD symptomatology. She's going to fall apart. She's not going to -- even giving her a simple IQ test, she starts to fall apart. So it has to be low stress. That would be the best I think we could expect from her at this stage in her life.
Q. On page 6 of the report, middle paragraph, you talk about, Mrs. Sutherland tries

48

Schuster

to limit her prescription drug intake given her experience of inhibiting and sedating side effects in the past.
A. That's what she told me.
Q. What were you referring to there?
A. When she took the medication in the past, that's what she experienced it as.
Q. "Past" being after the accident, or before?
A. I'm pretty sure after the accident. Do you have my notes somewhere?
Q. They should be all in here.
A. Let's take a look. I think it's even -- she takes two Vicodins a day at night, right. Yes, that's it. She -- or even with the medication she is taking now, she finds it too sedating. She takes two Vicodins a day.
Q. Okay. This is only post-accident medications?
A. Yes.
Q. Not pre-accident?
A. No.
Q. Do you know if she took any medication pre-accident?