UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND
------------------------------x
LYNN M. SUTHERLAND,

Plaintiff,

v. Civil Action No. 05-450-S

HYC, INC. and JEFFREY BARROWS,
Defendants.
------------------------------x

May 16, 2007
10:35 a.m.

Deposition of JAMES SMIROS, taken by defendants, pursuant to subpoena, at the offices of L'Abbate Balkan Colavita & Contini LLP, 1001 Franklin Avenue, Garden City, NY, before Lisa Mango, a Shorthand Reporter and Notary Public of the State of New York.



APPEARANCES:

DECOF & DECOF P.C.
Attorneys for plaintiff
One Smith Hill
Providence, RI 02903
BY: JOHN S. FOLEY

CLINTON & MUZYKA P.C.
Attorneys for defendants
One Washington Mall
Suite 1400
Boston, MA 02108
BY: ROBERT E. COLLINS

L'ABBATE BALKAN COLAVITA & CONTINI LLP
Attorneys for witness
1001 Franklin Avenue
Garden City, NY 11530
BY: ERIC S. HECHLER



Smiros
JAMES SMIROS,
called as a witness, having been duly sworn,
testified as follows:
EXAMINATION
BY MR. COLLINS:
Q. Could you state your name, sir.
A. James Smiros.
Q. Mr. Smiros, have you ever been to a deposition before?
A. Yes.
Q. You know the procedure. I'm sure your attorney explained it to you.
My name is Robert Collins. I represent HYC, Inc. and Jeffrey Barrows in a matter that is pending in the United States District Court for the District of Rhode Island involving a personal injury by Ms. Sutherland.
Just a couple of initial instructions. Please let me finish the questions before you start answering so the most important person here, the stenographer, can take down the complete question and answer and also so that you are answering the complete question I ask.
Nods, points, uh-huhs don't show up on



Smiros
the record, so if you could give a verbal response, yes, no, I don't remember, whatever the response is.
If at any time you want to take a break to confer with your lawyer or to go to the bathroom, please ask. I don't anticipate this to be too long. We are just looking for some information.
Could you give me your business address, sir.
A. 51 Glen Street, Glen Cove, New York 11542.
Q. What is the name of the business?
A. Smiros & Smiros Architects LLP.
Q. What is the business of Smiros & Smiros.
A. We are architects and interior designers.
Q. Presently how many employees do you have?
A. Approximately 18.
Q. This occurred in 2004. How many employees would you have had then?
A. Approximately the same.

Smiros

Q. Right.
A. That kind of thing.
Q. Now, who would obtain the clients?
A. Our firm. The firm would.
Q. Did she bring any clients in?
A. No. She introduced us to one client once, but it didn't come to fruition.
Q. How long did Mrs. Sutherland work for Smiros & Smiros? I guess it was as an independent contractor consultant?
A. Yes. I believe it was about two years.
Q. In the agreement with Mrs. Sutherland was there a time limit as to how long it would be?
A. No.
Q. Was there a termination clause or agreement?
A. I don't know if there was a termination clause. We had agreed to actually terminate -- I don't know -- I guess you could call it an agreement. Again, I'm not sure it was in writing.
We had at some point agreed to cease to operate together. That it did not make sense.



Smiros

It wasn't working. And that she would finish the projects she was working on for us within a certain time frame and then we would end the relationship.
Q. Do you recall when that was in relation to her accident?
A. It was supposed to happen before. We had agreed to terminate our relationship I want to say in June or July of that year. And we were supposed to wrap up those projects by August. I could be off by a month here or there.
Generally speaking, that's what I recall. Then -- what happened was we didn't wrap up the projects in the time frame that we anticipated. Frankly, because she was distracted with other things and wasn't focusing on them I didn't think.
But they didn't get done, whatever the case was. And then she had that unfortunate accident as well.
Q. Can you tell me what type of work she did? What would she do?
A. She would do furniture layouts and pick furniture pieces and fabrics and carpets and



Smiros

draperies and wall coverings, wall finishes for projects. Interior decor.
Q. Was there anything physical about her work in terms of physical requirements?
A. Well, you know, interior design is actually the -- the shopping piece of it is physically exhausting. I've done it. Going to the markets, it's a lot of work. It's walking. It's shopping.
When you talk about physical, it's not as though you are working in a warehouse, but, you know, I've shopped with interior designers and wanted to pass out by noon.
Q. So what you are saying is it is a lot of walking?
A. A tremendous amount of walking, yes.
Q. How about lifting? Is there any lifting involved?
A. Well, I will tell you when it comes time to do the interior installations, there's lifting and there's moving and propping and shifting things around. Very often you have help with that, but it's sort of a natural thing for the interior designers to get in there and start



Smiros

to shift things around as well.
Q. Can you tell me what were the projects that were unfinished?
A. She was working on two specific projects, the Balemian residence and the Ubertini residence.
Q. Could you spell the first one?
A. Balemian, B A L E M I A N. And Ubertini, U B E R T I N I.
Two houses that we were doing coincidentally next door to one another.
Q. And what was the stage that they were in as of August of '04? You said they were unfinished?
A. Well, the interiors were not complete.
Q. What was the reason you ceased to operate -- you said it wasn't working. What did you mean by that?
A. We had different -- I think different business philosophies perhaps.
Q. Can you expound on that? I don't really understand it.
A. Well, Lynn had certain financial requirements that we couldn't satisfy and it

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| LYNN M. SUTHERLAND, | ) CIVIL ACTION |
| | ) NO. 05-450-S |
| Plaintiff, | ) |
| | ) |
| VS. | ) |
| | ) |
| HYC, INC. and JEFFREY BARROWS, | ) |
| | ) |
| Defendants. | ) |

************************************

ORAL DEPOSITION OF
JOHN B. LENOX, M.D., Ph.D., P.E.
FEBRUARY 19TH, 2008

************************************

THE ORAL DEPOSITION of JOHN B. LENOX, M.D., produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 19th day of February 2008, from 11:41 a.m. to 1:43 p.m., before ARLINDA RODRIGUEZ, Certified Shorthand Reporter in and for the State of Texas, reported by stenographic and computer-aided transcription, in the Offices of Federal Court Reporters of San Antonio, 10100 Reunion Place, Suite 660, San Antonio, Texas 78216, pursuant to the Rhode Island Rules of Civil Procedure and the provisions stated on the record or attached hereto.



STIPULATIONS

It is further stipulated and agreed by and between counsel for the respective parties hereto that the original of the deposition of JOHN B. LENOX, M.D., shall be sent to him, JOHN B. LENOX, M.D., DESIGN EXCELLENCE, INC., 435 ISOM ROAD, SUITE 224, SAN ANTONIO, TEXAS 78216, for the purpose of obtaining the signature of the witness thereon before any notary public.



APPEARANCES

FOR THE PLAINTIFF:
JOHN S. FOLEY, ESQ.
DECOF & DECOF, PC
ONE SMITH HILL
PROVIDENCE, RHODE ISLAND 02903
(401) 272-1110

FOR THE DEFENDANTS:
ROBERT E. COLLINS
CLINTON & MUZYKA, PC
ONE WASHINGTON MALL, SUITE 1400
BOSTON, MASSACHUSETTS 02108
(617) 723-9165

ALSO PRESENT:
JOHN B. LENOX, M.D.
The Witness
ARLINDA RODRIGUEZ
Certified Shorthand Reporter



INDEX


| | PAGE |
|---|---|
| Stipulations | 2 |
| Appearances | 3 |
| Index | 4 |
| JOHN B. LENOX, M.D. Examination by MR. COLLINS | 6 |
| Witness Signature Page | 81 |
| Reporter's Jurat | 82 |

whatsoever to her thumb -- to her right thumb.
Q. And was that the scenario from Dr. King?
A. No. Dr. King's scenario, if he had had that scenario, the thumb would have been injured.
Q. Okay.
A. Dr. King's scenario is to have her grasp the sheet but with her thumb not grasping it.
Q. Okay.
A. So he has her thumb out.
Q. A variation on that?
A. Yes. I'll call it the King variation on how to grasp a sheet.
Q. Did you consider that?
A. I did.
Q. Okay. And did you reject that?
A. Yes.
Q. Okay. On what basis?
A. First of all, that would be an unnatural way to grasp a line if you're trying to balance yourself to keep you -- support yourself to keep from potentially falling off. Secondly, it's my opinion that the fracture to the proximal aspect of her proximal phalanx of her index finger, that it occurred close to the knuckle of this hand. And that for Dr. King's scenario to have accounted for that fracture, she would have had



to have wrapped her hand, if I can show you, way around the line -- way around the line to get that portion of that bone in position to be injured by his scenario.
And I feel like had she grasped the sheet as he's saying inexplicably with the thumb out, which is very unnatural, that that would not account for the fracturing to the proximal phalanx. That would account for fracturing more to the distal regions of that index finger and not the proximal region.
So based upon that analysis of where that major bone fracturing took place, I also would -- would tend to reject Dr. King's analysis, number one, because the thumb wasn't hurt and, number two, because the fracture on that index finger, in my opinion, appears on the wrong place.
Q. Okay. What other possibilities did you consider?
A. That was really the extent of the possibilities. I mean, I tried to see if there was anything else that would account for it. But, actually, in my report I mentioned, well, could she have had her hand on the deck --
Q. Palm down?
A. -- palm down with the -- with the lines slack. And then when we begin to tack and grind, could



the ring have gotten caught up in the sheet and gathered it up into the Lenox configuration. And as I say in the report, that's certainly -- I can't completely rule it out; but, boy, that's a real long shot. And I don't believe that the chances of that happening are very good.
Q. You were talking about the hand palm down -- I mean, from the report.
A. Slack line. And this is where I spoke to on Craig, the sailing captain. And he said that -- his statement to me was he feels like that from all of his knowledge and from his reading of the testimony, that the line wasn't that slack in laying on down on top to pick her up, so that probably wouldn't work like that. But I left it in the report anyway.
Q. So your opinion is it happened how?
A. Palm down on the top of the turning block, the forward aspect the thumb on top, the fingers draped down vertically on the side.
Q. Okay.
A. Unfortunately, the hand too close to the inboard line. And when the line started going through the turning block something snagged the flesh or the ring, perhaps, and at that point gathered on in and committed to the -- to the -- to the jamming of the



hand.
Q. Okay.
A. And no doubt jamming and, the best I can tell, deep into the turning block, too. The gap on that side where her hand would have gone is huge, and there is some testimony that, in effect, her hand was jammed and way up in there, too. So almost disappeared up in there.
Q. Okay. How -- as I understand it, you said your opinion is the hand -- the fingers were draped down?
A. Yes, sir.
Q. So what pulls -- what grabs them in?
A. The index finger has to have -- that or the ring has to have somehow snagged the sheet as it's coming by to the point where it, through friction or through contact, makes her hand come around inboard and then gather up under the sheet in between the sheave.
Q. Okay.
A. So it has to have been kind of caught in between somehow as the sheave is turning and the line is going in.
Q. How does it get caught?
A. I can't tell you.
Q. Does she have her hand around the sheet or --

let me strike that.
Do you have an opinion as to whether or not she had her index finger around the sheet?
A. Around the what?
Q. The sheet?
A. The what?
Q. Index finger.
A. Around the?
Q. Sheet.
A. I don't know that last word you're saying.
Q. The sheet. The rope.
A. Oh, the sheet. It's your accent. I'm sorry. I thought you were saying sheave, and you were saying sheet.
No. It was not around it. It was just close to the junction of the block and the sheet passing by quickly where it somehow gathered up her index finger or her fingers and drew her on in.
Q. Do you have an opinion as to how it was dragged in?
A. No. No. The Coast Guard mentioned at one point perhaps her ring snagged. I don't recall if she was -- if the Coast Guard was the only one who mentioned that. But that at least was the first time I read that theory, that perhaps her ring snagged and that's what



caused her to be gathered in.
Q. Do you know what type of ring it was?
A. It was described by Mrs. Sutherland I believe, maybe her husband, but I don't recall the details offhand.
Q. Okay. Do you have an opinion whether or not her ring was snagged on the sheet?
A. I don't know. It's certainly a viable working theory. Either that or her flesh itself was snagged and not her ring, or both those things were snagged. But I -- other than that, I don't have an opinion.
Q. Okay. Do you have any indication that there was anything about the sheet that grabbed her hand?
A. I don't know and --
MR. FOLEY: I just want to object to the form. Go ahead.
Q. (BY MR. COLLINS) Do you understand what I mean?
A. Yes, sir.
Q. Any knots or anything that could have been a grab?
A. I don't know. A little thread, a little snag, a little roughness. I don't know the answer to that. But if -- if let's say you and I had been at the accident scene and had been able to examine the sheet



and examine the turning block pulley and just look at the available forensic medical injuring evidence, perhaps we could know some of these other details. But with the concern to head her back on a rush basis to get medical assistance, you know, we didn't have a -- the Coast Guard didn't photograph the accident scene and those details, so we don't know the answer to that.
And no one ever asked the question of, when you examined the sheet afterwards, did you find a snag or blood or flesh or something. Nobody ever thought to go there. And so if that was observed, it's not in my record right now.
Q. Okay. Did you see any testimony from any of the witnesses to that effect?
A. No. I don't believe that was ever addressed by maybe you and Mr. Foley. And I'm not sure -- I mean, I'm not sure, if you'd ask the questions, they would have had anything to say about it either. That was my impression.
Q. But, I think you saw in the deposition where I asked the question: Was there anything about -- anything on the vessel that failed or that caused the accident.
A. You did.
Q. Wouldn't that be the time where, if there was



anything about the sheet, that that would have been the appropriate response?
A. Gosh, I don't think so. But you'd have to go to each individual person. I thought you were asking in the context, did something break or was there some failure or something of that nature when -- that's the impression I got when you were asking the very appropriate question. And they said no. This was the -- during the course of the normal operation that this took place.
Q. Now, can you tell me the mechanics of her injury? Somehow we've got her right hand going into the block and I believe you've indicated previously that she had no injury to her thumb and little injury to her pinky.
A. Uh-huh. Uh-huh.
Q. So tell me how the -- in your opinion, the injuries come about.
A. Having had a chance, the privileged chance to examine a mirror image of the subject block, I'm not able to address that. And much of the reason for not being able to address that is the fact that the opening through which her hand would be drawn in and jammed is huge. And then it narrows down to a passageway that's to small for her hand to pass.

So her hand was captured, it was being drawn in, and then it was being injured by one of several possible injury mechanisms as it's being jammed in there. In addition, I do believe that the degloving of her ring finger and possibly also the amputation was because with her hand entrapped there, that at some point when she withdrew forcefully, that the ring skeletonized and degloved her ring finger. The pulling, the sheering effect of the ring caught on something and drew the flesh off.

Q. What does skeletonize mean?

A. What they meant by that was when you deglove the finger, what's left is the, quote/unquote, skeletal ligamentous structure. And so they spoke of that medically as skeletonization. There's just the bone and the ligaments -- not all of them, but some of the bone and the ligaments and there's no flesh there.

So they said that this ring finger was essentially skeletonized from the distal portion of her proximal fourth phalanx all the way to the tip. And then the tip, the distal phalanx itself was amputated, was avulsed off and missing, too.

Q. Okay. So you're saying that it was her force of pulling her hand out that caused the distal?

A. That's my working hypothesis right now. It



was capturing of the ring in some way and then, more than likely, the yanking out of the hand that led to the loss of that flesh. The other possibility is that the ring caught on the sheet at some point and just the passing of the sheet through with her hand jammed led to the tearing off of the flesh. That's another possibility.

But in the cases of degloving I've seen, for instance, one case I had a young boy got his hand under a forklift wheel and his dad yanked him out from under the wheel, leaving the flesh from wrist level to the tips of his hands under the forklift wheel with the hand and wrist skeletonized, if you will. So I've always seen compression and then the yanking to cause this type of degloving in my experience thus far.

Q. Okay. So how -- I'm not sure you answered. You've got the degloving being basically caused by the ring --

A. Yes.

Q. -- and the force pulling up, but how does the injury to her index finger occur?

A. I can't give you those details now. I've had a chance to look at the turning block. I've had a chance to see how deeply inward her hand would be jammed. And it's such a complex process with so much



going on involving initial capture, travel inward, jamming of the hand and fingers, movement of broken pieces, open dislocations, almost near amputation of flesh and joints coming apart, that I can't tell you now how that happened.

If I had a more complete set of photographs of the hand with the fingers opened up or a more complete set of x-rays and if I'd been able to look at the turning block before we cleaned it up, then there's a good chance I could have come closer than what I'm saying now. But with the information level that I have now, I can't go into more detail.

Q. Okay.

A. And I'm also aware of the fact that, with her hand in there, she injured her -- twisted and injured her left wrist trying to get her hand out of there. So while this is taking place, she's not just throwing in the towel and letting it happen. She's trying to get that out of there and turning her body. And that's why they said she had injuries in her both hands.

And so she's doing things, putting tension on those structures being drug in and crushed together. So it's complex that I have not been able to give you more details on specific injury mechanisms or the relative timing of those injury mechanisms for these



multiple catastrophic injuries to fingers two, three, four.

Q. Did you -- did you consider the force that would be necessary to avulse the distal phalanx?

A. Not really. I don't know that that information is available. I've never seen anything like that in the biomechanics literature. You know, what it would take to pull it --

Q. To pull it out, yes.

A. Well, we've got open dislocation on one finger and a fracture on another, and we've got an avulsed joint. So these are huge forces with tremendous mechanical advantage over her hand, which is a relatively, you know, small, weak structure.

But I wouldn't know how to tell you what force it would take to pull the tip off, you know, like a Chinese torture or Iraqi torture. I don't know what it would take to yank the tip of someone's finger off or de-flesh the finger. I don't know that that data was ever acquired except perhaps by folks in World War II. But nobody in my circles would ever look at those reports offhand.

Q. Your report talks about there being progressively less force as you go down from the index towards the little finger?