# EXHIBIT "4"

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

LYNN M. SUTHERLAND, :

Plaintiff, :

v. : Civil Action No.:

HYC, INC., and JEFFREY BARROWS, : 05-450-S

Defendants. :

_________________________________/

The deposition of CAPTAIN PATRICK DERRY was taken on March 31, 2008 commencing at 1:34 p.m., at the Four Points by Sheraton BWI Airport Hotel, 7032 Elm Road, Baltimore, Maryland, before Suja Nair, a Notary Public in and for the State of Maryland,

REPORTED BY: Suja Nair

A. And that -- that the risk is --
Q. Or if a block fails, it can be projected into it? That's how we often will see it?
A. Yes.
Q. And that's not the case here?
A. No, it's not, but the blocks themselves, because of these things, because of the fact that -- the possibility of failure, because the possibility of being caught in a line that gets pulled, would then pull you into that block. Anything that -- that -- anything around that block you want to treat with a great deal of respect.
Q. Okay. Would it be prudent for a passenger to be holding on to a line even if it's not moving?
A. Not running a rigging, no. And therein, is a risk because new sailors don't recognize the difference between standing rigging and running rigging. Standing rigging is what's used to hold up masts and support gear; whereas, running rigging is used to control the sails. The running rigging will, in fact, move. It may be under a load.
In fact, under the -- as I understand it, this



boat was on the -- the starboard tack when the accident occurred. It was changing over from the starboard tack when the incident occurred, and that particular piece of rigging that's -- that running rigging for the line of sheet for the jib would have been under load, and it would have been very stiff and very still. It wouldn't have moved at all.
And so, you know, I -- on my boat I have a lucky thing that none of my standing rigging is -- is soft and none of my running rigging is wire. And so I just tell people don't touch anything soft.
Q. Okay. Now, in this occasion, the -- is it fair to say the main sail was not used?
A. It's my understanding it was not used.
Q. Okay.
A. I'm going by the depositions.
Q. Okay. And do you have an opinion as to whether or not that was prudent?
A. I would not -- I wouldn't venture to second-guess the captain on that. It's -- again, it depends on the wind. It depends on everything else. I can think of no reason why it would not be prudent.



Q. Okay. But when you have the main sail, you have the boom going one side --
A. That's correct.
Q. -- to the other?
A. Yes.
Q. Which someone could conceivably get hit with?
A. Yes.
Q. That's not the case here. This is --
A. No.
Q. Is it fair to say that there are two turning blocks?
A. There should be one on either side.
Q. One on the port and one on the starboard?
A. That's correct.
Q. And do you know of anything that blocks -- that obstructs the view of those turning blocks?
A. From the pictures I saw, there did not appear to be any mechanical obstruction to block the view from the Heritage to those turning blocks. The pictures I saw, of course, did not have any people in the area. If people were sitting on that edge of the cockpit, that could very well



block it or I could see where they would block it.
Q. Okay.
A. Put it that way.
Q. All right. Have you spoken to any other experts in this case?
A. No, I have not.
Q. John Lennox?
A. No.
Q. Have you seen any other expert reports?
A. No, I have not.
Q. Have you seen David DuBois's expert report?
A. No, I have not.
Q. Let me ask you. You refer to 46 CFR 177.960. Is it your contention that the turning block is an exposed hazard?
A. Yes, it is.
Q. And is it your position that that applies to this -- to the Heritage?
A. It would apply in the sense that it is, in fact, a hazard. It's my understanding that the Coast Guard waivered it on his particular boat recognizing that -- and

Page 70

they do this on other boats. I'm not -- well, there are certain things that if you cover these -- if you covered these over, if you made them completely safe, that they -- you remove them from any passengers being near them, you would probably lose a little bit of the -- what people are actually paying for. It's my assumption there are general -- their general charters are to take people out so they can experience racing 12 Meter boats, which is quite thrilling, as I understand.

Q. Okay. So it's your opinion that the failure to have a guard was in conformance with the regulation?

A. I believe -- I do not know of anything that would imply that they did -- that they were breaking any regulations by not having it guarded. But I think they had to have some type of a waiver, if I'm not mistaken.

Q. Okay.

MR. FOLEY: Just so the record is clear, we're not making any claim in the case that the vessel was in violation of that provision of the Code of Federal Regulations, and Captain Derry will not be asked any questions about hypothetical or actual violation of that CFR

Page 71

section.

MR. COLLINS: Thank you.

BY MR. COLLINS:

Q. Now, how about the safety orientation regulation, 46 CFR 185.506, does that regulation have any requirement concerning turning blocks?

A. No, it does not.

Q. So you don't base any of the failure to warn on the CFR?

A. No.

Q. I should correct that because you answered no to a negative.

Do you base any of your opinion on failure to warn on 46 CFR 185.506?

A. I do not, not on a sense that he has violated the CFR in failing to mention at that particular time, no.

Q. Now, did you read Captain Barrows' deposition as to what he maintains the safety orientation speech was?

A. Yes.

Q. And would that be in conformance? If he gave that safety orientation speech, is that in conformance with

Page 72

what -- your opinion?

MR. FOLEY: Object to the form.

MR. COLLINS: Let me -- let me rephrase it.

BY MR. COLLINS:

Q. If he gave the safety speech that he said he did, did he warn the passengers adequately?

MR. FOLEY: Object to the form.

THE WITNESS: Again, I -- yeah. I don't really know how to answer that question. If -- I'm not sure I remember the -- his safety speech well enough to make that or --

BY MR. COLLINS:

Q. Well, take a look at it.

If you could, Mr. Derry, read the transcript from Jeffrey Barrows' deposition, pages 51 through 55.

(Thereupon, a brief recess was held.)

BY MR. COLLINS:

Q. Okay. Now, you've read -- you read the pages from Mr. Barrows' deposition that I indicated?

A. Yes.

Q. If he gave that safety orientation speech, would

Page 73

that be in conformity with what you would require?

A. It would certainly -- it would be in conformity with the CFR, yes.

Q. Okay. Would it be in conformity with warning the passengers about the dangers you're opining about?

A. It would certainly serve as a warning of those -- of that danger, of the danger of the blocks.

Q. Okay. So it would satisfy you?

A. I'm not sure that simply -- given the proximity of that particular winch -- when you say it would satisfy me, I would -- if I were the captain of that boat -- is that what you're asking me to do is to speculate on that --

Q. Well, I'm asking you if Captain Barrows gave the safety orientation speech that he says he gave, would that be in conformity with --

A. It is in conformity with the CFR.

Q. And is it --

A. Is it --

Q. -- in conformity with --

A. It would serve as a warning regarding the running rigging.



Towson Reporting Co.
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting - Rockville
301-279-7599

Page 70

they do this on other boats. I'm not -- well, there are certain things that if you cover these -- if you covered these over, if you made them completely safe, that they -- you remove them from any passengers being near them, you would probably lose a little bit of the -- what people are actually paying for. It's my assumption there are general -- their general charters are to take people out so they can experience racing 12 Meter boats, which is quite thrilling, as I understand.

Q. Okay. So it's your opinion that the failure to have a guard was in conformance with the regulation?

A. I believe -- I do not know of anything that would imply that they did -- that they were breaking any regulations by not having it guarded. But I think they had to have some type of a waiver, if I'm not mistaken.

Q. Okay.

MR. FOLEY: Just so the record is clear, we're not making any claim in the case that the vessel was in violation of that provision of the Code of Federal Regulations, and Captain Derry will not be asked any questions about hypothetical or actual violation of that CFR

Page 71

section.

MR. COLLINS: Thank you.

BY MR. COLLINS:

Q. Now, how about the safety orientation regulation, 46 CFR 185.506, does that regulation have any requirement concerning turning blocks?

A. No, it does not.

Q. So you don't base any of the failure to warn on the CFR?

A. No.

Q. I should correct that because you answered no to a negative.

Do you base any of your opinion on failure to warn on 46 CFR 185.506?

A. I do not, not on a sense that he has violated the CFR in failing to mention at that particular time, no.

Q. Now, did you read Captain Barrows' deposition as to what he maintains the safety orientation speech was?

A. Yes.

Q. And would that be in conformance? If he gave that safety orientation speech, is that in conformance with

Page 72

what -- your opinion?

MR. FOLEY: Object to the form.

MR. COLLINS: Let me -- let me rephrase it.

BY MR. COLLINS:

Q. If he gave the safety speech that he said he did, did he warn the passengers adequately?

MR. FOLEY: Object to the form.

THE WITNESS: Again, I -- yeah. I don't really know how to answer that question. If -- I'm not sure I remember the -- his safety speech well enough to make that or --

BY MR. COLLINS:

Q. Well, take a look at it.

If you could, Mr. Derry, read the transcript from Jeffrey Barrows' deposition, pages 51 through 55.

(Thereupon, a brief recess was held.)

BY MR. COLLINS:

Q. Okay. Now, you've read -- you read the pages from Mr. Barrows' deposition that I indicated?

A. Yes.

Q. If he gave that safety orientation speech, would

Page 73

that be in conformity with what you would require?

A. It would certainly -- it would be in conformity with the CFR, yes.

Q. Okay. Would it be in conformity with warning the passengers about the dangers you're opining about?

A. It would certainly serve as a warning of those -- of that danger, of the danger of the blocks.

Q. Okay. So it would satisfy you?

A. I'm not sure that simply -- given the proximity of that particular winch -- when you say it would satisfy me, I would -- if I were the captain of that boat -- is that what you're asking me to do is to speculate on that --

Q. Well, I'm asking you if Captain Barrows gave the safety orientation speech that he says he gave, would that be in conformity with --

A. It is in conformity with the CFR.

Q. And is it --

A. Is it --

Q. -- in conformity with --

A. It would serve as a warning regarding the running rigging.

Page 74

Q. Would it be a sufficient warning?
A. I don't think if -- if that were the only warning and he never again addressed it or looked or -- or took positive steps to ensure that those blocks were always clear, no. I would not consider it to be, in and of itself, sufficient.
Q. Now, is it fair to say that there's no evidence that Captain Barrows or anyone on the crew or the passengers knew that, either, Mrs. Sutherland had her hand on the block or was holding the line?
A. I can't really address that. I wasn't there.
Q. Okay. Well, you read the depositions. Have you seen anything that says they knew that --
A. I don't --
Q. -- the hand was in that position?
A. I don't recall seeing anything, no.
Q. So what --
MR. FOLEY: Just as a procedural matter, make sure he finishes his question before you start to answer.
BY MR. COLLINS:
Q. What more would you require than the warning

Page 75

that was given?
A. I would warn the passengers, whenever I was tacking, to remain clear. I would also insist on a visual check to ensure that everything is clear before I make the turn. This is what I typically do on my boat.
Q. Did you understand that there was a tacking procedure on this vessel?
A. I'm not sure what you mean by procedure. There's a standard tacking procedure for all boats, and I'm not --
Q. Okay.
A. -- sure what you're asking.
Q. This boat, the Heritage, did they have a tacking procedure?
A. Well, I'm not sure I really understand the question. The obvious answer would be yes, because all boats have a procedure to tack. You couldn't possibly tack it without following a procedure.
Q. Okay.
A. So I don't know --
Q. Did you discern from the depositions what the

Page 76

tacking procedure was for the Heritage?
A. I found nothing out of -- unusual or different than a normal vessel tacking. It would be the standard -- common standard tacking procedures on any -- any vessel.
Q. Okay. Is it fair to say that each time there was a tack, that the helmsman would indicate something to the effect of ready, about or ready to come about? Did you see anything of that nature?
A. I saw -- I saw comments where people or the captain, at least, and the crew, mentioned that he had called -- he had called the turn. He had called the tack.
Q. Okay. And Mr. Sterns indicated that he had called that particular tack. Did you see that?
A. I -- I -- I don't recall that, but I would not be surprised. There's nothing in there that implied to me that he did not call the tack.
Q. Okay. And did you see also in there that the procedure was for the people up forward to respond?
A. Yes.
Q. And -- and then the helmsman would announce when the wheel was being turned?

Page 77

A. Yes.
Q. And is that an acceptable procedure?
A. Yes.
Q. And is that the standard procedure?
A. Yes.
Q. That's the way you learned it and --
A. That's the way everyone learns how to tack a vessel.
Q. And is it your opinion that that does not constitute a warning each and every time?
A. Not when you have inexperienced passengers on board, no, because inexperienced passengers -- with a trained crew, when you announce you're going to tack, everyone takes a specific position, and everybody is ready to go, especially a racing crew. They all go to a spot, and they all know exactly what's going to happen.
Inexperienced people would -- would not necessarily understand the warning. It's not uncommon when I tack my boat with guests on board -- and I do the very same thing. I announce I'm going to tack -- and, of course, I often have people, you know -- the entire crew is un -- is

Page 78

inexperienced. And so I'll have to look to each of them and say are you ready, are you ready, is everybody ready and then I have to look at all the lines to make sure they're all going to run and -- without hindrance.

And I often have to tell people I'm sorry. You're going to have to move over a little bit because this line is going to run out. So yeah, to a -- to an inexperienced passenger, no, I wouldn't think that giving the standard commands of ready, about or tacking or whatever this particular command is would be sufficient warning each and every time.

Q. Couple more questions.

In your report you talk about -- in the first paragraph -- the Captain was under obligation to ensure that his passengers and crew were aware of this danger.

What do you mean by ensure?

A. Take positive measures to -- I don't want to say the word ensure again. I don't know how to say this.

Take positive measures to determine that the -- the passengers and crew are not in any danger. By positive measures, I mean to physically sight a line, the flow of the

Page 79

line to make sure that it's not -- that no one is going to get caught in it, that it's not going to get caught in anything.

Q. You understand that on boats accidents happen?

A. Yes.

Q. And are you saying that the captain is an insurer of the safety of the passengers?

A. Absolutely. The captain is always responsible for the safety of his passengers and crew. I can think of no exception to that.

Q. And you equate that to being that he's an insurer of the safety of the passengers?

MR. FOLEY: I object to the form.

THE WITNESS: I'm not sure I understand the question.

BY MR. COLLINS:

Q. You used the word ensure.

A. Yes. Yes.

I see what you're saying. I'm sorry.

MR. FOLEY: I object to the form.

BY MR. COLLINS:

Page 80

Q. Are you aware that this vessel had a certificate of inspection?

A. I have not seen the certificate of inspection or a copy of it, but given the fact that they were carrying 14 passengers, they would have to have a certificate of inspection.

Q. Do you know on what occasions those certificate of inspection is given by the Coast Guard?

A. Anytime a vessel is to be used in commercial passenger -- carrying -- anything that is going to be carrying passengers for hire. And the vessel is -- well, they will issue it if you apply for it, is the short answer. But it's given to a vessel that's going -- intending to carry more than six passengers for hire.

Q. Do you know if -- if there is an inspection done by the Coast Guard?

A. Yes. I believe there is.

Q. And do you know if they looked for any hazardous conditions?

A. Absolutely. Yes, they do.

Q. Will they issue a certificate of inspection if

Page 81

there is a hazardous condition?

A. They will issue a certificate with a hazardous condition if they believe that the hazardous condition is acceptable and is not -- the removal of that condition would result in a substantial degradation of the vessel. An example of this would be -- I'm wording this wrong, I'm afraid but the -- an example would be you're required to have a lifeline of a certain number of inches above the deck. I believe it's 42 inches above the deck.

However, some boats -- some sailing vessels, a 42-inch lifeline above the deck would hinder the operation of the sails and actually get in the way of things. And so they will waiver that and allow certain sailing vessels to operate with a lifeline shorter than the 42 inches.

And that sort of thing, you can say that's a dangerous condition. The Coast Guard has determined that that particular height is what's required. But they'll -- again, they'll waiver it on those conditions.

Q. Okay. Is it fair to say you've never been in the Coast Guard?

A. No. I've never been in the Coast Guard.